Stanley MERZON, as Administrator of the Goods, Chattels and Credits of Paul Merzon, Plaintiff,

v.

The COUNTY OF SUFFOLK and James Emanuele, Defendants.

No. CV–85–3907 (ADS).

United States District Court, E.D. New York.

June 17, 1991.

Epstein & Kwasnik, New York City, for plaintiff; Fred L. Epstein, of counsel.

Kranz, Davis & Hersh, Hauppauge, N.Y., for defendant James Emanuele; Harry D. Hersh, of counsel.

E. Thomas Boyle, Suffolk County Atty., Hauppauge, N.Y. by Jeltje DeJong, Asst. County Atty.

## OPINION AND ORDER

SPATT, District Judge.

In the early hours of Saturday, October 27, 1984, at a grassy area behind a fence at the dead end of East Gate in Copiague, a twenty-three year-old man was shot and killed by a Suffolk County police officer. The facts leading up to the encounter in the grassy area are virtually undisputed. The occurrences in the grassy area, however, are controverted and the versions are diverse. As a result of this tragic occurrence, this section 1983 wrongful death and pendent state-law claims case was brought. The central issue presented before the Court is whether there was excessive force exerted by the police officer in violation of the decedent's rights under the Constitution and laws of the United States and under the laws of the State of New York.

## I. PRELIMINARY STATEMENT

This case was originally assigned to the late District Judge Mark A. Costantino. Although the plaintiff initially failed to demand a jury trial, such a demand was later made in an amended complaint. By memorandum decision and order filed on July 10, 1986, Judge Costantino granted the motion of the defendants to strike the jury demand. Thereafter, the case was randomly reassigned to this Court, which held a bench trial on March 19, 20, 21, 25 and 26, 1991. The following constitutes the Court's findings of fact and conclusions of law (*see* Fed.R.Civ.P. 52[a]).

## II. THE COMPLAINT

In the Complaint, the plaintiff-administrator Stanley Merzon, father of the dece-

dent Paul Merzon, set forth seven causes of action, as follows:

1. Pendent state-law claim based on assault and battery for damages for conscious pain and suffering against both defendants;

2. Pendent state-law claim based on assault and battery for damages for wrongful death against both defendants;

3. Claim for damages for both conscious pain and suffering and wrongful death based on violation of his Constitutional rights under 42 U.S.C. § 1983 against defendant James Emanuele;

4. Claim for ratifying acts of brutality, use of excessive force and permitting police officers to carry a second firearm in violation of 42 U.S.C. § 1983 and the rule in *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) against the defendant County of Suffolk;

5. Pendent state-law claim based on negligence with regard to the hiring, training, testing and supervision of defendant James Emanuele for damages for conscious pain and suffering against both defendants;

6. Pendent state-law claim based on negligence, alleging the negligent and reckless use of excessive force by defendant James Emanuele for damages for conscious pain and suffering against both defendants; and

7. Pendent state-law claim based on negligence for damages for wrongful death against both defendants.

### III. THE TRIAL

The Court will first review the evidence adduced at the trial. Throughout this review the Court will make credibility determinations and its required findings of fact. (Fed.R.Civ.P. 52[a]).

*The Plaintiff's Case:*

*The Facts Preceding the Encounter in the Grassy Area*

As stated above, the facts preceding the occurrences in the grassy area are substantially undisputed. On Friday, October 26, 1984, at about 4:00 p.m., Stuart Cantara entered the Something Else Pub in Copiague, Long Island, New York, where he remained drinking beer until approximately 1:30 a.m. the following morning. During that time, he consumed as many as twenty beers. That evening he was joined at the Something Else Pub by three friends, William Oberlin (also known as "Buzzie"), Neal Schwartz and Paul Merzon, his roommate. Some time during the evening Cantara got into an altercation with a former girlfriend and, in an angered, intoxicated state, left the bar, got on his motorcycle and sped off.

Just before he left the bar, Diane Zaffuto, another friend of Cantara, and Greg Giles drove up to the bar in time to see Cantara drive away on his motorcycle. The five friends were concerned about Cantara's safety since they knew he had been drinking, did not possess a driver's license and they saw a police car follow his motorcycle. In two cars, the five friends—Oberlin, Schwartz, Merzon, Zaffuto and Giles—drove to the East Gate home of Cantara and Merzon in an effort to meet and assist the intoxicated motorcyclist.

Meanwhile, a high-speed chase developed. At first Cantara was pursued by one police car with its lights and siren on. Cantara traveled at high speed and without lights in an effort to evade his pursuer. He sped down East Gate in the vicinity of his home closely pursued by the police car. The street and curb ended at a chain-link fence with a four or five-foot wide gap or hole in the fence. This gap or hole in the fence was described by some witnesses as a "gate" in the fence, although the photographs in evidence reveal that it is merely a gap or open space in the chain-link fence, where a section of fencing is removed (*see* Plaintiff's Exhibit 2E). East Gate is a cul-de-sac (*see* Plaintiff's Exhibits 2M and 2N). Shrubbery lined the side of the fence except for the area of the "gap". At the dead end, Cantara drove his motorcycle through the hole in the fence onto a grassy area east of the fence and then onto a street near an abandoned school on the other side of the fence. The police car was

forced to stop at the dead end and could not pursue further.

Cantara then circled around the neighboring blocks in an effort to return undetected to his home on East Gate. However, in doing so, he was observed by at least two other police cars who took up the chase. Again Cantara sped down East Gate, this time closely followed by two police cars with sirens and lights on. Once again Cantara reached the dead end and attempted to drive his motorcycle through the hole. The motorcycle apparently struck the fence and Cantara was thrown off and through the hole onto the grassy area. The two police cars stopped at the dead end on each side of the gap (*see* Plaintiff's Exhibit 2D), and the two police officers, the defendant James Emanuele and James Lilly, left their cars, went through the hole in the fence on foot and approached Cantara who was laying on the ground. At this point, the respective versions differed.

### The Occurrences at the Grassy Area

WILLIAM OBERLIN testified that he walked through the "gate" with Paul Merzon and saw Cantara on the ground with a police officer on each side of him. Cantara was struggling with the police officers who were holding him by the shoulders, trying to push him down to the ground. One of the police officers, the defendant James Emanuele, kicked Cantara in the side three or four times. Merzon "grabbed" Officer Emanuele's foot to stop him from kicking Cantara. Officer Emanuele then pushed Merzon back and Merzon fell down. Officer Emanuele was then ten feet from Merzon who got up and moved forward toward the two police officers. Oberlin got down on his knees to try to calm Cantara when he heard a shot. He looked over and saw Merzon falling back with his hands up and then fall to the ground. He did not see the actual shooting.

Oberlin further testified that his other friends were outside the gate and not in the grassy area. Oberlin could not recall whether Diane Zaffuto or Greg Giles even

walked down to the gate or whether they remained near the Merzon–Cantara house on East Gate. He stated that after the shooting he "believed" that Merzon was still alive in that he "heard him mumbling".

NEAL SCHWARTZ, a friend of Merzon, arrived at the Something Else Pub about 8:00 p.m. that night and saw Cantara arguing with someone. Schwartz was on crutches as a result of a work-related accident. He saw Cantara leave on his motorcycle and he followed with Merzon and Oberlin. Together they drove to the Merzon–Cantara home on East Gate. He saw Cantara coming east on East Gate followed by two police cars. All five of the friends walked toward the gate. Schwartz testified that only Merzon and Oberlin went through the gate into the grassy area. He stayed on the outside with Zaffuto and Giles.

Schwartz testified that looking through the gate, he saw Cantara on the ground and the two police officers holding him down. Cantara grabbed one of the officer's legs and pulled him down. Both officers started kicking Cantara. Merzon grabbed one of the officer's legs and said "stop kicking him" (Tr. at p. 273).[1] One of the officers pushed Merzon back and he fell back four to six feet, with his hands raised. The police officer pulled out his revolver and told Merzon to "hold it right there", and Merzon replied "okay" (Tr. at p. 274). A few seconds went by and the officer shot Merzon. Schwartz identified the shooter as the defendant James Emanuele. Schwartz stated that Emanuele was approximately eight to ten feet from Merzon at the time he shot him and Merzon was "[s]lightly turned away from the officer just a hair, to the right" (Tr. at p. 276).

Schwartz testified that he heard "gurgling noises" and attempts at breathing from Merzon, with blood oozing from his mouth for at least twenty or twenty-five minutes (Tr. at p. 278).

On cross-examination, Schwartz again testified that he never went through the gate onto the grassy area.

---

1. "Tr. at p. ____" refers to the page number of the trial transcript.

STUART CANTARA did not recall all of the events that occurred on that fateful evening. At that time, he lived with Merzon at 26 East Gate. He arrived at the Something Else Pub in the afternoon of October 26, 1984, at 4:00 or 5:00 p.m., and was drinking beer until he left some time about midnight. He testified that he probably had "around" twenty beers (Tr. at p. 367). At the Pub he had an argument with his former girlfriend and left on his Harley–Davidson motorcycle, even though he had no valid license to drive a motorcycle. A high-speed chase by police cars ensued. On his second pass down East Gate, with police cars in hot pursuit, he approached the fence. According to Cantara, a car smashed into the rear of his motorcycle, which ran into the fence, ejecting him over the bike (Tr. at p. 373).

Upon a review of all the evidence, the Court finds that the motorcycle was not struck by the police car, but itself struck a portion of the fence as he attempted to pass through it. Cantara was then propelled into the grassy area onto the ground. He tried to sit up and was knocked back down. His helmet came off in a backward position and was choking him. He was trying to rise to get his helmet off when he heard a shot. The next thing he remembers he was sitting in a police car. He did not see the actual shooting (Tr. at p. 375).

On cross-examination, Cantara conceded that he pled guilty to driving while intoxicated that evening. He stated that it was "possible" that he grabbed a police officer's leg and pulled him to the ground (Tr. at p. 394). Significantly, he recalls that "[t]here was like a fight going on, not a fight but pushing and things" (Tr. at p. 397). He remembers "pushing and shoving" and he heard a shot (Tr. at pp. 398–99).

Oberlin and Cantara were both charged with assault in the second degree, resisting arrest and obstruction of governmental procedures, and were both acquitted after trial in the County Court of Suffolk County.

DIANE ZAFFUTO, a former girlfriend of Merzon, worked at the Something Else Pub as a bartender, although not on the night of the incident. Zaffuto visited the Pub with Greg Giles, her then-boyfriend, at about 11:00 or 11:30 p.m. She later saw a commotion at the front door and Cantara got on his motorcycle. She was concerned because "Stuie was drunk" (Tr. at p. 426). She went to East Gate with Giles "to see if Stuie was okay, if he went home" (Tr. at p. 428). Zaffuto saw Cantara pass by on his motorcycle. He was "going real fast" with a police car behind him and she saw him go through the opening in the fence into the schoolyard (Tr. at p. 429).

Zaffuto does not remember anything after that, until she recalls walking to the dead end of East Gate. She saw Cantara on the ground being kicked by a policeman and Merzon standing with both his hands up. Her description in Court of Merzon with his hands up was substantially the same as that of Oberlin and Schwartz. She next remembers hearing a shot, at which time she "blacked out" (Tr. at pp. 431–32).

On cross-examination, Zaffuto testified that she did not actually see the shooting. The closest she saw Merzon get to either police officer was approximately fifteen to twenty feet. She does not think she went through the gate onto the grassy area.

GREG STEVEN GILES was the plaintiff's strongest witness. He stated that he did not know Merzon. Giles drove to East Gate with his friend Zaffuto and walked to the end of East Gate. He saw Cantara on the ground trying to get up and being knocked to the ground by two police officers. Merzon walked through the gate and pushed one police officer in the chest saying "knock it off, he has had enough" (Tr. at p. 474). Officer Emanuele pushed Merzon back four steps. Emanuele then took two steps back. At that point, according to Giles, Emanuele and Merzon were separated by nine feet. Officer Emanuele drew his gun and pointed it at Merzon and said "Get back" (Tr. at p. 478). Merzon raised both hands and said, "Oh, my God, don't shoot" and then Officer Emanuele fired

one shot at Merzon's upper torso and Merzon went down (Tr. at pp. 478–79).

Giles further testified that he was at the scene for four hours. An ambulance arrived thirty to forty minutes after the shooting. Remarkably, during all this time, according to Giles, Merzon was laying there, still alive and no one was attending to him. His testimony in this regard is as follows:

"Q Did you have occasion to observe the person of Paul Merzon after he was shot and you indicated he went down on the ground?

A Yes, I did.

Q Would you please describe what you saw?

A Well, it was at least 20 minutes after he was shot. He was still laying there and no one was attending him. I thought maybe if he was bleeding I could suppress the wounds by pressing direct contact. I walked over to him. Since no one else was I walked over to him. And he was still alive, at least 20 minutes later.

\* \* \* \* \* \*

THE COURT: All right. What did you observe about it?

THE WITNESS: He was speaking.

THE COURT: What did he say?

THE WITNESS: He said, oh, my God, I am going to die.

I placed my hand under his head and told him he is not going to die. I said I don't see any blood, I don't think you are going to die.

At that point one of the officers came up to me sticking a gun in my face and told me they would blow my head off if I go near the body again. I went back by the hole in the fence where I was standing all the time.

\* \* \* \* \* \*

Q Were you lying to Paul about seeing the blood?

A No, not at all. I didn't see any blood.

Q Describe what you saw?

A I was mostly looking at his face. I wanted to see if he was breathing. I wasn't examining the chest wound. I didn't see any wound. I didn't see any blood" (Tr. at pp. 481–83).

However, Giles testified before the Grand Jury shortly after the incident that police officers arrived at the scene, looked at Merzon and checked his pulse. Also, before the Grand Jury he testified that when he went over to Merzon, he was incoherent.

The Court does not credit the testimony of Greg Giles that Merzon was still alive twenty minutes after the shooting and that he saw no blood on his face or body. The photographs in evidence (*see* Plaintiff's Exhibits 2G and 2H), show Merzon lying on the ground on his back with visible blood on his face and hands. The gunshot wound perforated the aorta, the pulmonary artery, both lungs and the pericardium. Moreover, Dr. Arden, the Medical Examiner, later testified that death was almost instantaneous.

On cross-examination Giles stated that he, Zaffuto and Schwartz were at the gate but did not go through to the grassy area. At the time of the shooting, Merzon and Emanuele were "facing each other" and "parallel to each other" (Tr. at p. 516). There were approximately six and one-half feet between the gun muzzle and Merzon, considerably shorter distances than the measurements he gave before the Grand Jury.

Police Officer JAMES EMANUELE, who had training in martial arts and was a weight lifter, carried two sidearms on the evening of the occurrence. He had his service revolver in a holster on his right hip and a second revolver in a holster on his left hip with the butt facing front. He is right-handed. In his radio car, he got into the chase after Cantara's motorcycle on the second time around at approximately 1:30 to 1:40 a.m. With siren on, he pursued Cantara to the gate at East Gate followed by Officer James Lilly. In trying to drive through the gap, the motorcycle hit the fence and Cantara rolled off onto the grassy area. Emanuele parked his car, leaving the headlights on to illuminate the grassy area, as did Officer Lilly. He walked

through the gate onto the grassy area. Within a minute or so a group of people came through the gate. Zaffuto, Merzon, Oberlin and Giles all came through the gate, together with several other males.

Emanuele described what he said occurred in the grassy area. Cantara was lying on his back yelling and screaming profanities: "you scum bags, you are going to f_____ing die" (Tr. at p. 635). Cantara also said something about his friends. Both Emanuele and Officer Lilly were yelling to Cantara to "calm down ... take it easy." They wanted to see what was in Cantara's hands (Tr. at p. 635). Officer Emanuele then testified in narrative form as follows:

"I told Stuart Cantara, relax. I want to see your hands, let me see your hands. He was screaming at us, cursing at us. He was yelling at us.

*    *    *    *    *    *

There was a shadow behind me. I have turned to see what the shadow was.

*    *    *    *    *    *

I turned and there was a group of people going through the gate and they were yelling. There was a female who testified here, Diane Zaffuto and she was screaming, you f_____ing leave Stuie alone. You touch Stuie and you are f_____ing dead.

Paul Merzon was there and he walked through the gate. And he pointed right at me with his finger, and he said to me, you touch Stuie you are f_____ing dead. He pointed at me and said you are f_____ing dead if you touch Stuie ... Tonight is the night you are going to die. Exact words ... He pointed at me.

*    *    *    *    *    *

I turned and Stuart Cantara was taking PO Lilly to the ground. Grabbed him around the knees and he drove him into the ground and got right up on top of him and was punching him, punching him about the head and face.

Officer Lilly was trying to protect himself, was covering up.

I ran to where they were. I got on top of Stuart Cantara. I put my left knee into his side and tried to drive him off, off of Officer Lilly, and I couldn't do it. I took my nightstick and I hooked my nightstick on the left side of his body and I tried to pry him off Officer Lilly and I couldn't do it. I raised my nightstick to strike Stuart Cantara.

It was at that point that the group who threatened me and who was yelling at me, and including Paul Merzon, ran, and I was hit in all directions, front, back, all sides, I was punched around the head, hit on the side, I was being choked by William Oberlin. He was around the back and choking me, pulling me backwards off the top of Stuart Cantara.

At that point Paul Merzon grabbed the second weapon. He grabbed it and he pulled on it, and I managed to take my stick and I put it against his hands and swept his hand off the weapon.

*    *    *    *    *    *

I pushed him backwards, maybe slightly farther than the back of my leg. At that point I freed my right hand, and the girl Zaffuto was yelling to the group, take the stick, hold his arm, get his arm, all sorts of profanities screaming for them to get me.

I managed to pull my right arm free of whoever had it and managed to pull my weapon and I pointed it at a Paul Merzon's chest and I was screaming quickly and loudly, back off, please. I didn't want him near me any more.

At that point William Oberlin was choking me and he pulled me backwards. And he pulled me backwards and down to the side, and other people in the group are grappling with me. The nightstick is gone. I didn't feel it in my hand any more. It was taken from me. And I didn't know where it was.

The gun pointing at Paul Merzon's chest moved off his chest. I was pulling—being pulled backwards to the ground and the last thing I saw Paul Merzon lunged for the weapon ... And I was being pulled to the ground. I thought he had the weapon or on top of the weapon and I was terrified. I managed to get my gun back to the position and I fired on

the way down to the ground as he was reaching for the weapon.

I came down to the ground and as I reached the ground I pulled William Oberlin off me and I pulled the gun at him and looked at him and Paul Merzon was laying down on the ground. He wasn't moving a muscle or saying anything...." (Tr. at pp. 639–42).

Officer Emanuele testified that at the time he discharged his weapon, he was "terrified" and had no control of the people who were on him (Tr. at p. 642).

The Court notes that Officer Emanuele's testimony was sprinkled with many "approximates". Also, he signed a supplemental police report which contained factual errors. Emanuele explains that he was very upset at the time and pointed out the errors to the detective but was told to sign it anyway.

At this point in the trial the plaintiff rested. There was a motion by the defendant County of Suffolk to dismiss the plaintiff's action as against it. The Court granted the motion on the following grounds:

"The plaintiff failed to establish any evidence that the actions of Police Officer Emanuele resulted from an official policy of the County of Suffolk. There was no proof adduced that the plaintiff was deprived of his constitutional rights pursuant to any custom, policy, regulations or decisions of the County of Suffolk.... There is no evidence here that the county authorized, sanctioned, or ratified any unconstitutional actions taken by Police Officer Emanuele, or that the county conveyed in any officially promulgated policy or persistent practice, or any deliberate indifference involving this occurrence, unless it could be a long seated psychological inculcation of thoughts, which there is no evidence of at this time. There is no evidence that there was any county policy or custom or regular or basic indifference, or failure of training that contributed in any degree on [sic] the shooting death of Paul Merzon. Rather, the evidence appears to the Court at this time that the tragic incident was an isolated incident and that it oc-

curred quickly, spontaneously. And if there was a constitutional violation and that's what the Court will rule on when the case is over, it was not in any way sanctioned or ratified by the County of Suffolk, or at least no such evidence was presented.

Therefore, the Court grants the motion of the defendant County of Suffolk to dismiss the complaint at the end of the plaintiff's case for failure to prove a prima facie Monell case or any other case against the County of Suffolk" (Tr. at pp. 706–08).

Although never raised by counsel for the plaintiff, in reviewing the record prior to rendering this decision, the Court considered, *sua sponte*, the possibility that the County could be vicariously liable as the employer of the defendant Emanuele on the pendent state-law claims for assault and battery for conscious pain and suffering (first cause of action), wrongful death (second cause of action), negligence in the hiring of Officer Emanuele (fifth cause of action), negligence and excessive force resulting in conscious pain and suffering (sixth cause of action), and negligence resulting in wrongful death (seventh cause of action). As a result, by Order dated April 22, 1991, the Court reconvened the parties on May 1, 1991 and afforded them the opportunity to reopen the trial with regard to the pendent state-law claims against the County and/or to offer additional evidence with regard to said claims.

Following the conference with counsel on May 1, 1991, the parties declined the opportunity to reopen the trial and no additional evidence was adduced.

*The Defendants' Case:*

Dr. JONATHAN L. ARDEN, board certified in anatomic and forensic pathology, was, in October 1984, a pathologist and Deputy Medical Examiner in the office of the Medical Examiner of Suffolk County, He is currently the Deputy Chief Medical Examiner of the City of New York.

On October 27, 1984, at approximately 3:50 a.m., he was called to the grassy area near East Gate and examined the dece-

dent's body which had a gunshot wound to the upper right part of the chest. He saw blood in the nose and mouth area and on the hands of Merzon.

Dr. Arden conducted the post-mortem examination and prepared and signed the autopsy report. He recovered the bullet in the left side upper torso within the soft tissue behind the left armpit (the rear portion of his underarm). Dr. Arden described the track of the bullet as follows:

"The bullet wound began in the upper right front of the chest.... And then it enters into the *right chest cavity* through the space between the first and second ribs....

\* \* \* \* \* \*

As the track continues it now goes to the central, through the *central portions of the chest*.... And the important concept in the medical terminology is we are in the middle of the chest cavity where the heart and the larger blood vessels have their locations.

In this area located just above the heart itself the track of the bullet penetrates through the sack surrounding the heart and blood vessels and then through the roots of the two largest blood vessels in the body. These two largest arteries are the pulmonary artery and the aorta. They are collectively referred to as the great vessels.... Both of these in turn are penetrated by the path of the bullet....

The bullet then continues on its path through the body entering from the central compartment *into the left chest* cavity. And in doing so perforating through the left lung....

\* \* \* \* \* \*

At this point having exited the chest cavity that the bullet path enters the soft tissue of the sides of the chest and the underarm area.... and terminates, as I said, adjacent to the border of the (left) shoulder blade where I recovered as I described a deformed large caliber lead bullet.

Now, the only other important point concerning the internal examination of the body relative to the gunshot track is that there was a large amount of bleeding internally, not only in the soft tissues I described, but there were also large accumulations of blood in each side of the left and the right chest cavities" (Tr. at pp. 725–28 [emphasis supplied] ).

The trajectory of the bullet after it entered the upper right front of the chest was that it traversed the body from the right to the left and ended under the left armpit. It was not a "front to rear and out" wound—rather, it went generally from right to left and very slightly downward and toward the back.

The cause of death was a single gunshot wound that perforated both major blood vessels and the lungs, and the subsequent bleeding caused by such a devastating injury. Significantly, Dr. Arden testified that death could have occurred as soon as fifteen to twenty seconds, and as much as "a few minutes or several minutes" (Tr. at p. 730). As to consciousness, Dr. Arden stated that the decedent could have been conscious for fifteen to twenty seconds or possibly a few more seconds and that conscious activity such as speaking "would not be possible" after receiving the gunshot wound (Tr. at p. 732). The sounds surrounding Merzon's death, if any, were agonal respirations, which denote the several short breaths taken upon death. Further, Dr. Arden testified that he saw bleeding from the mouth and nose, which occurred "very soon after the gunshot wound" (Tr. at p. 732).

While in a demonstrative pose off the witness stand, Dr. Arden testified that the wound track could be consistent with the victim crouching and turning to the left by reaching with his right hand over to the shooter. From the track of the bullet from right to left inside his body, Merzon would have had to be turning markedly to his left with his right arm at the time he was shot.

Dr. Arden also testified that he found stippling on the upper chest portion of Merzon's body. "Stippling," as described by Dr. Arden, are partially burned gunpowder particles that emit from the barrel of the gun with the bullet and become embedded

into the victim's skin, leaving burn marks or dots (*see* Defendants' Exhibits F1, F2 and F3; Plaintiff's Exhibit 2P [photographs of the decedent indicating stippling marks surrounding bullet wound]). He also removed a small piece of skin and confirmed microscopically that it contained "stippling". In addition, he participated in the test-firing of the weapon involved to ascertain if a similar stippling pattern existed (*see* Defendants' Exhibits G1–6).

As a result, Dr. Arden was of the opinion that the muzzle of the gun was approximately two and one-half to three feet from Merzon's body when the shot was fired. Based on all of his findings, Dr. Arden was of the opinion that it was not possible that Emanuele and Merzon were face to face at the time of the shooting; nor could Merzon have been turned slightly to the right; nor could Merzon have been as far away as eight feet from the weapon.

Police Officer JAMES LILLY was the operator of the second police car following Cantara on his second pass down East Gate. In pursuit with his lights and siren on, he saw the motorcycle strike the fence at the dead end of East Gate and Cantara fall off the motorcycle. Officer Lilly entered the grassy area, where Cantara was laying on the ground cursing him. He saw a group of six or seven people coming through the fence behind him. He asked them to "back off" and that "this had nothing to do with them," but "they kept coming" (Tr. at p. 790). Cantara then reached up and grabbed Officer Lilly's right leg and pulled him down to the ground and they "rolled around". Cantara was on Officer Lilly's chest and, with his knees on both sides of him, struck him in the chest and in the head. Officer Emanuele tried to remove Cantara from Lilly.

Officer Lilly testified that he then saw Emanuele being pulled back by "three or four people who were in the crowd behind" them (Tr. at p. 794). As to this crucial point in the occurrence, Officer Lilly testified, as follows:

"Q Tell us what you saw at that point?

A At that point Officer Emanuele was struggling with three or four other individuals who had their arms all over him. They were trying to pull him down to the ground.

Q Did you see any women in this group of people?

A There was one woman I noticed, yes.

Q What, if anything, did you see this woman do?

A She was struggling with Officer Emanuele also.

Q What did you see further at this point?

A At that point I observed an individual come from my right in front of my feet and lunge across Officer Emanuele and try to attack him or grab him by the waist.

Q Did you see where that individual's hand was with respect to Officer Emanuele's equipment or belt?

A Right around the belt.

Q What did you see at that point?

A I saw him struggling with the belt.

Q What person struggling with the belt?

A I saw the person who is the deceased struggling with the belt.

Q Which portion of the belt? What portion of the belt?

A The left side.

Q Then what?

A Officer Emanuele managed to kick him back and shove him backwards.

Q Then what did you see?

A Officer Emanuele screamed to back off and pulled his service revolver.

Q While Officer Emanuele was screaming back off and pulling his service revolver out were there any individuals in or around him?

A Three still, three or four people around him, holding his shoulders and waist and pulling him back.

Q Then what did you see?

A The deceased then lunged at Officer Emanuele again and Officer Emanuele fired once.

Q Did you see where he was lunging at?

A He was going right back to the belt.

Q Which area of the belt?

442

A  The left side.
Q  Of what?
A  Officer Emanuele's belt.

\*   \*   \*   \*   \*   \*

Q  At that point, sir, at the paint [sic] of the shooting what were you thinking? A  I was thinking if Mr. Merzon had gained control of Officer Emanuele's second gun that my life would be in danger, Officer Emanuele's life would be in danger and anyone else there for that matter" (Tr. at pp. 795–98).

Detective DENNIS GANNON, previously a licensed funeral director for nine years, then a police officer, tried to intercept the Cantara motorcycle but never got into the pursuit. He heard a radio call that shots were fired and arrived at the grassy area at East Gate within thirty seconds of the call. He examined Merzon's body. His pupils were fixed and there was no pulse. In his opinion, the person was dead.

Police Officer WILLIAM BROWN was in the pursuit at one time and lost the Cantara motorcycle. He arrived at the grassy area from thirty seconds to one minute after a radio call. Merzon was on the ground and not breathing. The police log showed that an ambulance arrived at the scene within seven minutes of the call for assistance.

The defendants then called four residents of East Gate, who were the only truly disinterested witnesses in this case.

EVERETT NEWMAN resides at 39 East Gate, one house from the dead end and the grassy area. On the evening in question at approximately 2:00 a.m. he heard the sounds of a motorcycle passing his house on two occasions and a police car. The police car had its lights on but it was foggy. He got out of bed and went to the window. He heard a man's voice saying something like "freeze or halt", a woman's voice saying "Vinny or Jimmy", and then a shot (Tr. at p. 897). He noticed a lot of people in the area.

SAMY MELEK lives at 41 East Gate, the house next to the fence and grassy area. That evening he heard a lot of loud noises. He went to his daughter's window and saw two police cars in front of the gate with their lights on. It was difficult for him to see because of the trees and bushes in the way. He saw movement behind the bushes and "a lot of struggles between persons" (Tr. at p. 885). He also heard the struggles. He heard cursing before the shot was fired. He heard the sound of "banging" like someone kicking somebody. He heard the words "freeze", and "hold it" and "stay down" (Tr. at p. 885).

In his appearance before the Grand Jury a short time after the occurrence, he testified that the one who fell from the motorcycle and was on the ground kicked one of the police officers and they both fell down.

In the Court's view, the two crucial witnesses in this case are JOAN O'LEARY and her brother, JAMES BURKE. Joan O'Leary lived at 36 East Gate, the third house from the dead end. On October 27, 1984, she had just returned home from work as a waitress about 12:30 to 1:00 a.m. and was watching television and having something to eat with her brother and sister. She heard the sound of a motorcycle "coming pretty fast down the street" and went to look (Tr. at p. 891). She saw the motorcycle pass by her house and go through the small opening in the gate at the dead end. A police car was following the motorcycle. Since she continued to hear the motorcycle she stayed at her front door looking out. She then saw the motorcycle again coming down her street followed by two police cars. The motorcyclist "zipped on by again really fast" and then she heard a crash (Tr. at p. 896). She saw the police cars stop in front of the gate and both police officers jump out.

O'Leary then walked out of her house and stood on her front walkway watching what occurred. The two police cars were stopped parallel to each other on either side of the opening to the grassy area. She was able to see between the police cars and into the grassy area.

"Q  And were you able to see beyond the opening? A  Yes. I saw everything" (Tr. at p. 899).

\*   \*   \*   \*   \*   \*

"Q Did it cause any problems, the lights from the police vehicle from the place where you were?

A I can just say this, that night everything seemed like daylight. I saw everything like as clear as day. I saw the people there, I saw everything. So as far as what the fog or the lights did, I can't answer you, I am not sure. But what I saw was referring [sic] very clear and I wished I didn't, but I did" (Tr. at p. 910).

O'Leary saw the two police officers talk to the person who had been on the motorcycle. Then she saw a group of people walking down the street right in front of her "laughing and talking to each other" (Tr. at p. 900). There were about six or eight persons, all male except for "one girl and she was in front of them" (Tr. at p. 900). The female was wearing a black leather jacket and had dark hair. One of the males had a crutch.

The testimony by O'Leary as to what then occurred, is crucial:

"Q All right.

Where did you see this group of individuals go?

A They went right in through the fence and they were talking to that guy also.

Q Did you see—

THE COURT: Talking to which guy?

THE WITNESS: The guy laying down there, the guy with the motorcycle, they were all talking to him.

Q Did you see all of those individuals walk through that opening of the fence to the other side?

A Yes, I did" (Tr. at p. 901).

She then saw the policemen and the group of people all talking to the man on the ground "to keep him down, like lay down, stay down" (Tr. at p. 902). Then, the atmosphere changed dramatically:

"Q Did you see this group of people at any point get close to any of the police officers?

A Well, then it seemed like at one point they stopped talking to him for a moment. The group was kind of on one side of the opening to like the left side of the opening. And then the policemen were standing to the right side of the opening.

Before you know it there wasn't a separation, the girl came up to the one policeman and started punching him in the chest. And then right after that they all kind of like—I didn't see the policeman any more. They were all like around him and all over him.

Q You saw this group of individuals around and all over this certain policeman?

A Yes. I didn't see the policeman any more because he was out of my sight and they were all like around him.

Q Did you see pushing and shoving?

A Yes. There was a lot of movement going on. No one was standing still any more, once the girl started to punch him in the chest then a whole bunch of movement started happening. There was a whole bunch of movement and I didn't see the other policeman any more. I didn't see that one anymore. He was just in the middle of all that, I can only guess. I didn't see if he went anywhere.

THE COURT: You say one police officer was in the midst of this pushing and shoving?

THE WITNESS: Yes.

THE COURT: And one was gone?

THE WITNESS: Yes" (Tr. at pp. 902–03).

&ast; &ast; &ast; &ast; &ast; &ast;

"Q Can you tell who was shuffling and scuffling?

A All of them, all of them" (Tr. at p. 912).

During this time, O'Leary heard a lot of yelling. She then heard a sound of a gunfire and everything got quiet and the group of persons separated. "They all kind of went apart and ... moved away from each other" (Tr. at p. 904). She then ran into the house and dialed 911.

JAMES BURKE is the brother of Joan O'Leary and the owner of 36 East Gate. On that evening he heard the motorcycle coming down the street, followed by a police car with sirens and flashing lights.

The motorcycle came around a second time followed by police cars with sirens. He walked outside with his sister and looked to the dead end. He saw the stopped police cars and a motorcycle "hanging by the fence" (Tr. at p. 920). He saw about six persons walking down the street toward the fence. There were five males and a female. "They walked past me in a rush and they went through the opening in the fence" (Tr. at p. 922). Burke then related what he saw in the grassy area:

"Q And what did you see at that point? Would you tell his Honor.

A At that point what happened is several of them went to talk to the police officers and then within about 60 seconds or thereabouts, within a couple of minutes, I don't know the exact timing, all of a sudden everything started breaking out into a fight and everybody started jumping around the police officers, and the police officers were surrounded. And there was a lot of noise and a lot of pushing and shoving going on, and fists were flying.

Q Did you see all the individuals involved in that?

A All I saw was everybody in a melee. I couldn't tell you who was involved. I couldn't identify anybody.

Q Did you see anybody strike anybody?

A All I saw was everybody surrounding the police officers and pushing and shoving. There were fists flying. Who was hitting who exactly I couldn't tell you.

Q And did you hear any sounds? Did anybody say anything, sir?

A I heard hold it. And then within a couple of seconds later I heard a shot fired.... And everybody just ran for the hills" (Tr. at pp. 922–24).

On cross-examination, Burke testified that a "melee" was taking place and he was a witness to the shooting. He stated that "[t]he two police officers were surrounded by five—by a whole group of individuals" (Tr. at p. 927). He saw that "a fight took place, and in the pursuit of this fight a shot was fired.... I saw a group of people surrounding a police officer going into a fight" (Tr. at pp. 927–28).

Detective CHARLES BARTELS arrived at the grassy area shortly after the shooting. He spoke to Officer Emanuele at the scene who told him that "Paul Merzon grabbed his gun and he shot him in self defense" (Tr. at p. 943).

All sides rested.

## IV. ADDITIONAL FINDINGS OF FACT

Apart from the findings of fact and credibility determinations set forth above, the Court makes the following additional findings:

1. Death was almost instantaneous. Merzon never regained consciousness. Plaintiff failed to establish any conscious pain and suffering.

2. Officer Emanuele was forced to make a split-second decision—with Merzon lunging for the officer's gun.

His objective belief that his life and his partner's life were in danger was a fair and reasonable belief in the split-second tense, muddled situation, with other people physically hanging around his neck.

3. The Court does not credit the testimony of Giles that Merzon talked to him twenty minutes after he was shot and that he saw no blood on his face.

4. The Court finds that Schwartz, Zaffuto and Giles all went through the fence into the grassy area. The Court does not believe their testimony to the contrary.

## V. THE BURDEN OF PROOF

The plaintiff has the burden of proving every element of his section 1983 claim and pendent state-law claims by a fair preponderance of the credible evidence (see generally S. Nahmod, *Civil Rights & Civil Liberties Litigation—The Law of Section 1983* § 3.01, at p. 123 [2d ed. 1986]). To "establish by a preponderance of the evidence" means to prove that something is more likely so than not so (see *Nissho–Iwai Co. v. M/T Stolt Lion,* 719 F.2d 34, 38 [2d Cir.1983]). In other words, a preponderance of the evidence means such evidence as, when considered and

compared with that opposed to it, has more convincing force, and produces in this Court's mind the belief that what is sought to be proved is more likely true than not true.

In determining whether any fact in issue has been proved by a preponderance of the evidence in the case, the Court may consider and weigh the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

In order for the plaintiff to prevail in this case, the evidence that supports his claim must appeal to the Court as more nearly representing what took place than that opposed to his claim. If it does not, or if it weighs so evenly that the Court is unable to say that there is a preponderance on either side or if the scales are equally balanced, the issue must necessarily be resolved against the plaintiff (*see Larson v. Jo Ann Cab Corp.*, 209 F.2d 929, 931 [2d Cir.1954] [Frank, J.]).

## VI. CONCLUSIONS OF LAW

The Court makes the following conclusions of law (*see* Fed.R.Civ.P. 52[a]).

*Section 1983*

■ "[N]ot every instance of force proscribed by state law rises to the level of a constitutional violation so as to support a section 1983 action" (*Finnegan v. Fountain*, 915 F.2d 817, 821 [2d Cir.1990]). By reason of the decision of the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), we now know that a constitutional violation based on excessive force at the pre-arrest stage is established only by showing that the use of force was " 'objectively unreasonable' under the Fourth Amendment" (*see Finnegan v. Fountain*, *supra*, 915 F.2d at p. 821), and is no longer governed by the "shocking to the conscience" test of *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973).

Prior to *Graham v. Connor, supra*, in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985), the United States Supreme Court ruled in a case involving the use of deadly force by a police officer. In a decision delivered by Justice White, the Court stated that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment" (471 U.S. at p. 7, 105 S.Ct. at p. 1699). Further, the Court held:

"Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force" (471 U.S. at p. 11, 105 S.Ct. at p. 1701).

After *Tennessee v. Garner, supra*, the law with regard to "excessive force" constitutional violations was further refined by the United States Supreme Court in the seminal *Graham* case. In *Graham*, it was held that where the claim against a law enforcement officer arises in the context of an arrest, investigatory stop or other "seizure", the sole source of constitutional protection is the Fourth Amendment. That is, all claims that law enforcement officials used "excessive force," including deadly force in the course of any kind of "seizure" are properly analyzed under the Fourth Amendment's "objectively reasonable" standard, rather than under a substantive due process standard (490 U.S. at p. 395, 109 S.Ct. at p. 1871; *see also Heath v. Henning*, 854 F.2d 6, 9 [2d Cir.1988] [applying Fourth Amendment "reasonableness "test" pre-*Graham*]). Since the conduct giving rise to this action occurred during the course of a "seizure", and neither post-arrest or post-conviction, the issue presented must be judged by the Fourth Amendment's "objective reasonableness" standard as set forth in *Graham*.

The Supreme Court in *Graham* provided the following guidance in determining excessive force claims under the Fourth Amendment:

"Today we make explicit what was implicit in *Garner's* analysis, and hold that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investi-

gatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than a 'substantive due process' approach.

\* \* \* \* \* \*

The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. (*See Terry v. Ohio, supra,* 392 U.S., [1] at 20–22, 88 S.Ct., [1868] at 1879–1881 [20 L.Ed.2d 889 (1968)).]

\* \* \* \* \* \*

The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See *Scott v. United States,* 436 U.S. 128, 137–139, 98 S.Ct. 1717, 1723–1724, 56 L.Ed.2d 168 (1978); see also *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1879 (in analyzing the reasonableness of a particular search or seizure, 'it is imperative that the facts be judged against an objective standard'). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."

■ In *United States v. Schatzle,* 901 F.2d 252 (2d Cir.1990), the Second Circuit stated that *"Graham* requires that the district court impress upon the jury the necessity of assessing whether the force employed by [the police officer] was reasonable in light of the particular situation and dangers facing [the police officer] at the time he encountered [the plaintiff]" (*id.* at

p. 255; *see also Powell v. Gardner,* 891 F.2d 1039, 1043–44 [2d Cir.1989] ).

In this case we are concerned with the type of "seizure" by a police officer referred to in *Graham.* As recently stated by a leading commentator, "the Fourth Amendment standard is somewhat less onerous than the due process ... test ... and does not require a showing that the officer acted with malice or evil intent" (Schwartz, "Legal Responsibility For Police Brutality", *New York Law Journal,* May 14, 1991). Rather, the focus is "on the circumstances confronting the police at the time of the arrest without regard to their underlying motives or attitudes towards the suspect" (*Miller v. Lovett,* 879 F.2d 1066, 1070 [2d Cir.1989] ).

■ Considering all of the evidence adduced at trial, the Court finds that the plaintiff failed to establish, by a fair preponderance of the credible evidence, that the deadly force used by Officer Emanuele violated the Fourth Amendment rights of Merzon. Accepting the testimony of key witnesses O'Leary and Burke, the Court finds that Officer Emanuele was set upon by a number of persons who were pushing, shoving and hitting him. These persons were physically hanging on or around Officer Emanuele, while cursing and threatening him. Further, the Court finds that Merzon must have been bending or reaching with his right hand to his left, in the area of where Emanuele's second revolver was located. The uncontroverted forensic evidence by the medical examiner, Dr. Arden, reveals that the shooting could not have occurred face-to-face or when Merzon turned to the right. In order for the bullet to traverse from the right side of the chest across the heart area, through the "great vessels" (pulmonary artery and aorta), and down into the left chest cavity, perforating the lung and ending in the armpit, the decedent must have been turning or reaching to the left, not facing Emanuele or falling back with his arms extended in an upward position.

The Court also finds persuasive the tests performed by Dr. Arden by firing the

weapon at cardboard targets at varying distances. These cardboard targets reveal that when fired, the closer to the target, the more stippling is left. Specifically, shots fired at a range of 18 to 24 inches indicate clear and dense stippling (*see* Defendants' Exhibits G1 and G2), whereas shots fired at a greater distance of 30 to 36 inches, indicate little or no stippling (*see* Defendants' Exhibits G3, G4 and G5). This evidence was uncontroverted and indicates that Merzon was within Officer Emanuele's immediate physical vicinity, rather than eight to ten feet away as the plaintiff's witnesses stated.

The evidence in this case, although close, tips in favor of the defendant, and, accordingly, the Court finds that the plaintiff has failed to sustain his burden of proof.

*Qualified Immunity*

■ At the outset, the Court notes that the burden of proof with respect to the issue of qualified immunity rests with the defendant (*see Raysor v. Port Auth. of N.Y. & N.J.*, 768 F.2d 34, 40 [2d Cir.1985], *cert. denied*, 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337 [1986]). In *Finnegan v. Fountain, supra,* also an excessive force case, it was held that the application of qualified immunity is, ultimately, a question of law for the Court to decide (*see* 915 F.2d at pp. 823–24).

The Court finds that the defense of qualified immunity has been sustained. Under the facts found by the Court, the defendant Emanuele did not violate clearly established federal law.

In *Graham, supra,* the Supreme Court expressly left open the issue of the application of qualified immunity in excessive force cases arising under the Fourth Amendment (*see* 490 U.S. at p. 399 n. 12, 109 S.Ct. at p. 1872 n. 12). The Court noted, however, that "the officer's *objective* 'good faith'—that is, whether he could reasonably have believed that the force used did not violate the Fourth Amendment—may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983" (*id.*). In *Finnegan v. Fountain, supra,* 915 F.2d at p. 822–23, the Second Circuit held "that the

qualified immunity defense is generally available against excessive-force claims".

As to the interplay of the "objective reasonableness" standard enunciated in *Graham,* and the defense of qualified immunity as set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) and refined in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), commentators have observed the following:

"*Graham* also left open the application of qualified immunity to excessive force Fourth Amendment claims. Most lower courts, however, have applied qualified immunity to the *Graham* standard, thereby in effect giving an officer charged with excessive force two levels of reasonableness protection. Thus, even if an officer used force that was objectively unreasonable under *Graham,* he may be protected from individual monetary liability if he reasonably believed, based upon the facts and circumstances known to him, that the force used was lawful" (1 M. Schwartz & J. Kirklin, *Section 1983 Litigations Claims, Defenses and Fees* § 3.7, at pp. 153–54 [2d ed. 1991] [footnotes omitted]; *see also* M. Schwartz, "Legal Responsibility for Police Brutality", *New York Law Journal,* May 14, 1991 ["The double reasonableness protection enjoyed by police officers charged with excessive force makes it very difficult for § 1983 claimants to prevail against them"]).

■ In sum, although an officer's conduct may be "objectively unreasonable" under the Fourth Amendment analysis of *Graham,* he or she may nonetheless be entitled to a cloak of qualified immunity against personal liability under the *Harlow* standard. It appears to this Court that in certain excessive force claims, such as the instant case, the Fourth Amendment determination, which directly involves the question of whether the police officer objectively reasonably believed that the force used was necessary under the circumstances, may merge with the question of whether or not he violated any clearly established federal law or Constitutional right (*see, e.g.,*

*Dixon v. Richer,* 922 F.2d 1456, 1463 [10th Cir.1991]).

In this case, the Court finds that Officer Emanuele not only acted objectively reasonable in view of the imminent potential threat to his life and the lives of others around him, but he did not violate any clearly established federal law or Constitutional right. From his precarious position in the grassy area, he made a split-second decision in a tense and rapidly evolving situation. In this Court's view, an objectively reasonable use of force was employed. Accordingly, under these circumstances, Officer Emanuele is entitled to the protection of the defense of qualified immunity.

*Pendent State–Law Claims of Assault and Battery*

▮ The plaintiff must establish all of the elements of a cause of action sounding in assault and battery. A civil "assault" is the intentional placing of another in apprehension of imminent harmful or offensive contact (*see Lambertson v. United States,* 528 F.2d 441, 444 [2d Cir.], *cert. denied,* 426 U.S. 921, 96 S.Ct. 2627, 49 L.Ed.2d 374 [1976], *quoting Masters v. Becker,* 22 A.D.2d 118, 254 N.Y.S.2d 633 [2d Dep't 1964]; *see also Collom v. Incorporated Village of Freeport,* 691 F.Supp. 637, 641 [E.D.N.Y.1988]). The elements of a civil "battery" are (1) bodily contact, which is (2) harmful or offensive in nature, and (3) made with intent (*Masters v. Becker, supra; Portnoy v. Bucalo,* 82 Misc.2d 590, 370 N.Y.S.2d 799 [Sup.Ct. Nassau County 1975]; *see generally* 1 F. Harper, F. James & O. Gray, *The Law of Torts* § 3.3 [elements of battery] and § 3.5 [elements of assault] [2d ed. 1986]).

▮ The Court finds that the plaintiff has made out a prima facie case of an assault and battery, since the evidence showed that there was a harmful bodily contact made with intent. Also, there is a presumption from such proof that there was no justification (*Cassidy v. Cady,* 49 Misc. 478, 97 N.Y.S. 1046 [Sup.Ct.App.T. 1906]). The presumption is rebuttable, however, and if the defendant presents proof of justification, the ultimate burden

of proving the absence of justification rests with the plaintiff (*see id.*).

▮ In order to establish the defense of justification in a civil battery action, it must be shown that the person attacked was under a danger or apparent danger of death or of great bodily harm (*see Barbagallo v. Americana Corp.,* 32 A.D.2d 622, 299 N.Y.S.2d 626 [1st Dep't 1969]), "subject to the fundamental limitation that in protecting oneself no more force is permissible than will reasonably effect such protection" (*Decker v. Werbenec,* 36 Misc.2d 220, 232 N.Y.S.2d 260 [Sup.Ct. Ulster County 1962]).

The plaintiff contends that the defendant Emanuele violated the provisions of New York's Penal Law § 35.15 setting forth the defense of "justification".

The pertinent provisions of New York Penal Law are as follows:

**"§ 35.15 Justification; use of physical force in defense of a person.**

\*     \*     \*     \*     \*     \*

2. A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

(a) He reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating; except that he is under no duty to retreat if he is:

\*     \*     \*     \*     \*     \*

(ii) a police officer ... acting pursuant to section 35.30."

An officer is authorized to use deadly physical force when he or she reasonably believes such to be necessary to defend the officer or another from what he or she reasonably believes to be the use or imminent use of deadly physical force (*see* N.Y. Penal Law § 35.30[1][c]). Under such circumstances, the officer is under no duty to retreat (*see id.* at § 35.15[2][a][ii]).

In *People v. Goetz*, 68 N.Y.2d 96, 497 N.E.2d 41, 506 N.Y.S.2d 18 (1986), the New York Court of Appeals enunciated a hybrid subjective/objective analysis with regard to a private person under Penal Law § 35.15, namely, that the shooter had to subjectively believe that deadly force was necessary to avert the imminent use of deadly force and secondly, that this belief was objectively reasonable under the circumstances.

The Court finds that on this record, Officer Emanuele possessed the subjective belief that deadly force was necessary to prevent imminent use of deadly force directed to him and his partner by Merzon. Further, the Court finds that, on the credible facts adduced in this case, such a belief was objectively reasonable under the totality of circumstances.

As stated above, Officer Emanuele was surrounded by persons, physically clinging to his neck and shouting obscenities. His partner was also embroiled in a fight. In the midst of this melee, the evidence shows that Merzon reached in the direction of Officer Emanuele's revolver, at a range close enough to reasonably instill the apprehension in the officer that Merzon was lunging for the officer's weapon. The evidence amply supports the finding that Officer Emanuele believed deadly force was necessary to avert the imminent use of deadly force and, that in light of the circumstances that the officer found himself in, these beliefs were objectively reasonable.

Accordingly, the Court finds that the plaintiff failed to establish by a fair preponderance of the credible evidence, the lack of justification of the use of deadly physical force by Officer Emanuele.

*Negligent Hiring and Training*

The fifth cause of action alleges a pendent state-law negligence action against the County, based on alleged negligence in the hiring, training, testing and supervision of Officer Emanuele. No proof whatsoever was adduced to support such a theory of liability and this cause of action is dismissed.

*Negligence*

The sixth and seventh causes of action are based on the negligent use of excessive force by Officer Emanuele. The proof is uncontroverted that the firing of the shot by Officer Emanuele was intentional, and not caused by any negligent act. Accordingly, the plaintiff failed to establish any "negligent firing" and these causes of action are dismissed.

In this regard, the Court notes that *Rafferty v. Arnot Ogden Memorial Hosp.*, 140 A.D.2d 911, 528 N.Y.S.2d 729 (3d Dep't 1988), is instructive. In *Rafferty* it was held that intentional assault was legally incompatible with negligence, as follows:

"A close reading of the amended and second amended complaint fails to clarify if plaintiff's single cause of action is one for negligence or if it alleges a cause of action for the intentional tort of assault and battery. As we stated in *Mazzaferro v. Albany Motel Enters.*, 127 A.D.2d 374, 376, 515 N.Y.S.2d 631, 'New York has adopted the prevailing modern view that, once intentional offensive contact has been established, the actor is liable for assault and not negligence * * *.' 'There is, properly speaking, no such thing as a negligent assault' (Prosser and Keeton, Torts § 10, at 46 [5th ed.])" (528 N.Y.S.2d at p. 730).

## VII. CONCLUSIONS OF LAW

The Court makes the following additional conclusions of law:

1. As to the section 1983 cause, the plaintiff failed to establish, by a fair preponderance of the credible evidence, that the defendant James Emanuele used excessive force in violation of the Fourth Amendment, in causing the death of the decedent.

2. The plaintiff failed to establish, by a fair preponderance of the credible evidence, that the defendant James Emanuele violated the constitutional rights of the decedent under the Fourth Amendment with regard to an unreasonable search and seizure.

3. The defendant established, by a fair preponderance of the credible evidence,

that the conduct of Officer Emanuele did not violate any clearly established constitutional or statutory rights of which a reasonable police officer would have known. Therefore, the defense of qualified immunity has been established.

4. Although the plaintiff established the commission of a civil assault and battery, the defendant James Emanuele proved, by a fair preponderance of the credible evidence, that he was justified in causing the death of the decedent, under the provisions of the New York Penal Law § 35.15.

5. The plaintiff failed to establish, by a fair preponderance of the credible evidence, that the County of Suffolk was negligent in the hiring, training, employing, supervision, testing or screening of the defendant James Emanuele.

6. The plaintiff failed to establish, by a fair preponderance of the credible evidence, that the defendant County of Suffolk was negligent in continuing the employment of the defendant James Emanuele.

7. The plaintiff failed to establish, by a fair preponderance of the credible evidence, that the defendant County of Suffolk was negligent in any manner which could have contributed to the death of the decedent.

8. The plaintiff failed to establish, by a fair preponderance of the credible evidence, that the defendant James Emanuele was negligent in the manner in which he fired his revolver during the incident in question.

9. The plaintiff failed to establish by a fair preponderance of the credible evidence, that the decedent suffered any conscious pain and suffering following the gunshot in the incident at issue.

Accordingly, the Court directs the Clerk to enter a judgment pursuant to Fed.R. Civ.P. 58, dismissing the complaint against both defendants.

SO ORDERED.