BERNARD McCUMMINGS, Respondent, v NEW YORK CITY TRANSIT AUTHORITY, Appellant.

First Department, February 20, 1992

APPEARANCES OF COUNSEL

*Joel A. Brenner* of counsel *(Jonathan Cory Scott* with him on the brief; *David Breitbart,* attorney), for respondent.

*Lawrence Heisler* of counsel *(Anita Isola* and *Lawrence A. Silver* with him on the brief; *Albert C. Cosenza,* attorney), for appellant.

### OPINION OF THE COURT

MILONAS, J.

At approximately 8:00 P.M. on June 28, 1984, Jerome Sandusky was attacked by a number of youths in the 96th Street station of the Eighth Avenue subway line in the course of an abortive robbery attempt. Two Transit Authority police officers, Christine Mead and Manuel Rodriguez, who were on undercover patrol, heard the elderly victim's screams and came to his assistance. As the officers approached the staircase with their guns drawn, one of the culprits, Nathan Woods, evidently acting as the lookout, yelled "Yo". Two other perpetrators, Jacob Wise and plaintiff Bernard McCummings, were on top of Sandusky at the lower level, the former with a choke hold around the victim's neck and plaintiff rummaging through his pockets; some of Sandusky's belongings were

strewn about the floor. The parties offered differing versions as to what transpired next. According to Officer Rodriguez, he identified himself, shouting, "Police, don't move", but both Wise and plaintiff lunged at him, thereby causing him to discharge five shots. Two of the bullets struck McCummings in the back, one severing his spine and rendering him a paraplegic.

McCummings admitted that he was engaged in robbing and beating Sandusky but claimed that after being alerted by Woods' signal, he broke off the assault and fled down the other staircase in the opposite direction. He stated that he was some 17 to 20 feet away from Officer Rodriguez when he was shot in the back. Plaintiff denied that he ever lunged at the officer. Plaintiff's medical expert testified that McCummings' spinal cord was immediately transected and that he instantly lost all weight-bearing capability, and since he was found at the bottom of the stairs that is where he was shot. Defendant offered no credible medical evidence to the contrary. Officer Rodriguez asserted that despite plaintiff's wounds, plaintiff was able to run down a stairway before collapsing. On the direct examination of Officer Rodriguez, the jury heard him testify about three prior incidents involving the use of his firearm. The shootings were found to be "justified" by the Transit Authority. Officer Rodriguez twice before shot at fleeing suspects and missed, the first time firing twice, the second time emptying his gun. On another occasion, Officer Rodriguez shot and killed a stray dog which was apparently rummaging through his garbage can.

The jury, clearly accepting McCummings' account of the incident, found that Officer Rodriguez had used excessive force against plaintiff, who had previously pleaded guilty to robbery and spent some three years incarcerated in State prison. The panel then awarded him a total of $2.5 million for past and future pain and suffering, $622,142.55 for future medical supplies and equipment and $1.2 million for future nursing and other home care services. In that regard, it should be noted that the evidence demonstrates that one of the bullets that entered from the back and transected his spine caused total paralysis from the mid-chest down, resulting, among other things, in complete and permanent loss of urinary, bowel and sexual function. On appeal, defendant New York City Transit Authority has advanced a series of contentions which have either not been preserved or do not constitute reversible error.

■ ■ Defendant urges that the action should have been dismissed pursuant to Penal Law § 35.30 and the decision of the United States Supreme Court in *Tennessee v Garner* (471 US 1) or alternatively, that the holding in that case is not germane to the instant situation and, in any event, should not have been retroactively applied to this matter. Yet, since defense counsel not only did not object to reliance upon *Tennessee v Garner (supra),* but acknowledged that *Garner* is both controlling and retroactively applicable, defendant may not for the first time before this court endeavor to disclaim the relevance and applicability of *Garner* (CPLR 5501 [a] [3]; *De Long v County of Erie,* 60 NY2d 296, 306; *Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 317). Similarly, the Transit Authority failed to advise the trial court that it deemed it improper to charge the jury pursuant to the standard of reasonableness of an officer's conduct as enunciated in *Tennessee v Garner (supra)* and defendant may not now advance such an argument on appeal (CPLR 4110-b). Defendant's assertion of qualified immunity is also precluded as not having been preserved and even on the merits is without substance inasmuch as the Transit Authority could be liable under the doctrine of respondeat superior *(Frazier v State of New York,* 64 NY2d 802).

■ In *Tennessee v Garner (supra,* at 11), the Supreme Court declared that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so". Therefore, in the view of the court therein, where "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force" *(supra,* at 11). One indicator cited by the court as illustrative of the danger presented by the suspect is whether he menaces the officer with a weapon.

It is significant that defendant never challenged the legal validity of any portion of the trial court's lengthy charge concerning the use of physical force by a police officer. Defense counsel merely requested that the court read to the jury the actual language of Penal Law § 35.30, as well as a specific paragraph in *Tennessee v Garner (supra),* notwithstanding that

the statute and the Supreme Court ruling had been exhaustively explained to the members of the panel. The Transit Authority, insisting that Officer Rodriguez had no way of knowing whether or not the perpetrators were armed, appeared to believe that quoting from the subject Penal Law section and legal authority, could somehow benefit the defense's position, but, as the Trial Judge pointed out, Officer Rodriguez testified that the assailants' arms were outstretched and lunging at him without being in possession of any deadly weapons. Indeed, to the extent that the court provided an advantage to either party, it was more likely to have been to defendant than plaintiff by, for example, emphasizing that the burden of proof rested upon the plaintiff with respect to each and every element relating to the officer's use of deadly force.

■ Defendant also complains that the court improperly permitted the jury to consider the Transit Authority's 1982 and 1986 rules and regulations. First, it should be pointed out that defendant's attorney never protested the admission of the 1982 regulations nor ever moved that they be stricken. If anything, he acquiesced in their introduction into evidence and even affirmatively utilized these regulations in examining various witnesses both on direct and cross. Not until the precharge conference did defendant's lawyer assert that the 1982 regulations imposed a higher standard than the Penal Law or *Tennessee v Garner (supra)*, and that they not be included in the jury instructions. Although the court denied the request, it stated that it would merely direct the panel to consider the regulations in deciding whether or not Officer Rodriguez acted with a reasonable belief that he was justified in the use of deadly force, and this is what was done. Defendant, in its appellate brief, concedes that it did not object to the admission of 1982 rules and regulations but argues disingenuously that they were only relevant as to claims subsequently dismissed (such as the allegation that the Transit Authority had negligently failed to train its officers regarding the appropriate use of deadly force) and, thus, not submitted to the jury. Yet, this is not a distinction ever put forward by defendant to the court; its only concern appeared to be with the standard for employing deadly force.

Further, contrary to defendant's contention that the 1982 regulations set more stringent requirements than otherwise mandated by statutory or case law *(see, Lesser v Manhattan & Bronx Surface Tr. Operating Auth.,* 157 AD2d 352, which held that internal operating rules must be excluded if they compel

a standard transcending reasonable care), they do no more than authorize Transit Authority officers to apply deadly physical force in response to a felony involving or threatening physical force. The 1982 regulations provide in pertinent part that: "The minimum level of force will be used whenever preventing or terminating a crime, or when arresting a person for a crime. A firearm or other deadly physical force will only be used when any other level of force is insufficient to effect police control of a felony involving physical force or imminent use of physical force against oneself or another."

Not only did the foregoing rule not impose a stricter standard but it largely follows the dictates of Penal Law § 35.30. Equally noteworthy is that Captain John Doyle of the Manhattan-Bronx Task Force and defendant's own witness, testified that the Supreme Court ruling in *Tennessee v Garner (supra)* actually limited the reliance upon force; therefore, the 1982 regulations had to be amended to raise the degree of care to that necessitated by *Garner*. Accordingly, defendant's position with regard to the 1982 regulations is simply unsupportable.

As for the 1986 regulations, which were promulgated in direct response to *Tennessee v Garner (supra)*, the court, over the Transit Authority's objection, initially allowed their introduction during the re-cross-examination of Captain Doyle because it had concluded that defense counsel had "opened the door." Thereafter, lawyers for both parties had Captain Doyle read from and interpret the regulations. The next day, defendant unsuccessfully moved for a mistrial due to the admission of the 1986 regulations. Plaintiff's attorney agreed to withdraw them from evidence, and the court, striking from the record all reference to these rules and regulations, charged the jury that it disregard any testimony relating to the 1986 regulations (the panel was never supplied with the regulations themselves). While delivering its final instructions to the jury, the court again advised against considering any evidence that had previously been stricken. There is absolutely no basis here to find that the jury did not comply with the court's curative instructions or that the testimony involving the subject regulations was so damaging as to taint the entire trial even if the jurors had failed to follow the Judge's admonition.

The dissent's difficulty in accepting the meaning of *Tennessee v Garner (supra)* is demonstrated by the implied criticism directed against the reasoning of the majority of the

United States Supreme Court therein. Yet, notwithstanding the dissent's apparent dissatisfaction with *Tennessee v Garner (supra),* defendant not only never challenged its applicability but, instead, accepted that the ruling in that case was controlling here. Indeed, the requests for charge which were submitted to the Judge by the parties were exchanged in advance, and defendant certainly had the opportunity to present its own requests and to contest plaintiff's proposal. Yet, an examination of the precharge conference conducted by the court reveals that defendant agreed with the Judge's entire proposed jury instructions, except in one particular. Thus, the following conversation occurred between the court and the parties' counsel.

"THE COURT: * * * With respect to five, request five—do you have any objection if I should define—I don't know why I have to define 'serious physical injury.'

"MR. SIERADZKI [plaintiff's attorney]: That would only have applied had you used the language of *Garner,* which makes reference to serious physical harm or injury, to define that term would have some meaning. But since you're not using that term—

"THE COURT: I will be using that term.

"MR. SIERADZKI: Then it should be defined. The jury has the right to know.

"THE COURT: I will be using the term of a deadly weapon. A police officer is defending himself or believes that it's necessary to defend himself from what the officer reasonably believes the use or imminent use of deadly physical force. I will add 'or serious physical harm.'

"MR. SIERADZKI: Then you should define that, too.

"There is a Penal Law definition in the 1984-85 Penal Law, which you're reading to them from 3530 *[sic].*

"MR. KUZMACK [defendant's attorney]: I would submit, your Honor, that we don't know what the *Garner* Court meant by 'serious physical harm.'

"MR. SIERADZKI: We can interpret *Garner.*

"If we're interpreting it in New York, for purposes of a New York trial, then you have a right to interpret a Federal Court which interprets a Tennessee statute, so that it applies to a New York statute.

"MR. BREITBART [plaintiff's other attorney]: That's the definition in the New York Penal Code.

"THE COURT: Well, that may not be the definition of 'serious physical injury' under the civil statutes of the no-fault threshhold civil statutes.

"MR. KUZMACK: That's correct, your Honor.

"THE COURT: It's an entirely different thing.

"MR. BREITBART: We're talking about 3530 *[sic]*, which is a penal statute.

"THE COURT: That's true.

"MR. SIERADZKI: And we're using the Penal Law to define that penal statute term.

"How can you use a civil statute term to define a penal statute?

"THE COURT: It's also defined differently now. It's in here somewhere.

"MR. SIERADZKI: I read it.

(Discussion off the record)

"THE COURT: I will also charge this, referring to five.

"I will define 'serious physical injury.'

"MR. KUZMACK: Respectfully except, your Honor."

Defendant's attorney did not, significantly, offer a suggestion for a possible alternative charge or even explain the precise reasons for his objection. Yet, pursuant to CPLR 4110-b: "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court, out of the hearing of the jury, shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict stating the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

Moreover, CPLR 5501 (a) (3) limits review by the Appellate Division to "any charge to the jury, or failure or refusal to charge as requested by the appellant, to which he objected". Thus, it is axiomatic that a purported error in a Judge's charge is not preserved for review unless it is clearly brought to the court's attention prior to the case being sent out for consideration by the jury *(De Long v County of Erie, supra; Derdiarian v Felix Contr. Corp., supra)*, and an objection is

deemed waived if it does not unambiguously and explicitly apprise the court of the alleged error and expressly request the pertinent charge sought *(Moore v Leaseway Transp. Corp.,* 49 NY2d 720; *DiSalvo v Bortle,* 58 AD2d 997; *see also,* 4 Weinstein-Korn-Miller, NY Civ Prac ¶ 4017.01 *et seq.).* As the court clearly observed in *Petosa v City of New York* (52 AD2d 919, 920), the objection to a charge "must state the matter to which objection is being made *and the grounds for such objection.* A general objection is not sufficient where the correct charge might have been obtained by specifically calling to the trial court's attention the alleged error and the reason for such error". Therefore, the defense lawyer's unadorned "[r]espectfully except, your Honor" was scarcely adequate to preserve for review the single disagreement which he voiced with the court's proposed jury instructions.

Ironically, the minutes of the precharge proceedings reveal that the court spent considerable efforts to prune plaintiff's request to charge, often at defendant's request and over the expressed dissatisfaction of plaintiff's counsel. Specifically, the court granted in its entirety (except for one minor item not in issue on appeal) defendant's request to charge, stating that "[w]ith respect to defendant's request to charge, I will charge everything here". The rules of preservation serve the salutary purpose of giving fair notice to the trial court and to the adverse party of the claimed error and the proposed solution. Allowing a party to seek reversal on appeal on an unpreserved error is inherently unfair both to the jurist whose conduct is being reviewed and to the adverse party who had no meaningful way to respond to the claimed error. This is especially so where, as here, during an extensive charge conference defense counsel claimed ignorance on the law and stood mute when plaintiff's proposed charge relating to "serious physical harm" was being analyzed and negotiated. Furthermore, the court, most significantly, granted defendant's request to charge in its entirety.

Defendant's claim that the Judge erred in not reading as a whole section 35.30 of the New York Penal Law is similarly not preserved for appellate review. On several occasions, in two separate charge conferences, the court advised the attorneys that he agreed with their assessment that the case was controlled by section 35.30 of the New York Penal Law and *Tennessee v Garner (supra).* He stated that he would not read the statute but would charge its substance, as well as the holding of *Tennessee v Garner (supra),* and that he would

"paraphrase" the statute. Defense counsel did not object to this ruling and did not specifically request the reading of the statute in his extensive request to charge. Defendant did offer his own version of the Penal Law and *Tennessee v Garner (supra)* in his written request to charge, and this was in fact incorporated at length into the Judge's charge to the jury. Defendant's request to read section 35.30 came for the first time after the Judge's charge and when the jury was about to deliberate. Nowhere in the record, however, is there a single objection pointing to any claimed error in the charge relating to the Penal Law section or any suggestion as to how or where the court may have gone astray. The Judge's position was that his charge was "[s]ubstantially consistent with the Penal Law Sections". Since defendant failed to point out to the court where it had erred, it must be assumed that the court was correct.

As for the criticism raised by the dissent concerning the court's charge as to what "level" of force was reasonable or excessive, it is notable that defendant did not assert this at trial. Moreover, in a Second Circuit case, *Heath v Henning* (854 F2d 6), cited by the dissent, the court reversed a jury verdict in favor of defendant police officers because the court had used an incorrect standard in instructing the jury on the officers' use of deadly force in effecting an arrest and remanded the matter for a new trial. According to the Second Circuit, which relied both on *Tennessee v Garner (supra)* and section 35.30 of the New York Penal Law, "[t]he legal standard to be applied in cases where a police officer has used deadly force against a fleeing felony suspect is one of reasonableness under the Fourth Amendment" *(supra,* at 8), and "[t]he proper standard requires that a jury consider whether the officers acted reasonably, under the totality of the circumstances, in using deadly force to effect the arrest" *(supra,* at 9).

It is evident that the "level" of force which may be employed by officers is that which a jury regards as reasonable under the circumstances of the particular case. Defendant never disputed that this was an issue to be resolved by the jury at trial. The defense attorney specifically acknowledged that "the justifiableness of a shooting can only be judged by legal standards. The legal standards are 3530 *[sic]*, the Penal Law, and *Tennessee v. Garner."*

The issues which the jury had to determine are minimized by the truncated version offered by the dissent as the "central question". Throughout the trial there were two distinct and

conflicting scenarios offered by the parties. According to the court, "as I see it, it is the plaintiff's claim that the shooting occurred while the plaintiff was unarmed, had already fled, had already released the victim and already fled down the stairway and was shot in the back at the bottom of the stairway. That is the plaintiff's claim * * * On the other hand, the defendant's contention is that the shooting did not occur that way at all." Defendant's lawyer then responded, "No, your Honor. It occurred because the police officer was threatened with serious physical injury, and that he fired two shots at McCummings, and McCummings was shot while standing on the landing and that he ran down the stairs after being shot." The parties agreed that it was a clear matter of fact for the jury as to whether "the plaintiff was shot while lunging at the officer and that the officer was reasonable to believe he was in fear of his life or that deadly physical force was being used against him, or whether he was shot escaping" (stated by Mr. Kuzmack, the defense counsel).

One must discard or severely edit both fact versions developed by the testimony at trial to form the "central question" offered by the dissent, i.e., "whether an officer employed by defendant New York City Transit Authority used excessive force by shooting plaintiff McCummings in order to effect his apprehension while in immediate flight from the mugging of an elderly man." Yet, even viewing the issue as stated, the inescapable conclusion is that it still poses many questions for resolution by the jury, and, as described by the dissent in discussing the difficulties in attempting to interpret and apply the ruling of *Tennessee v Garner (supra)*, "[t]he conclusion to be drawn is that *Garner (supra)* contemplates that such an assessment will be made ad hoc, based upon the facts presented", and "[i]ndeed, the courts that have confronted the problem seem to have adopted this perspective." This is precisely the role that the jury fulfilled in this case.

The dissent endeavors to set up a straw man, never even suggested by defendant, to the effect that plaintiff is seeking recovery on both Fourth Amendment and tort grounds and that these doctrines are separate and distinct and mutually exclusive. Thus, almost everything involved in this case is now tainted by the "confusion" surrounding these two contradictory claims, particularly the instructions delivered to the jury regardless of whether or not actually objected to by the defense. This does not, however, prevent the dissent from recommending remand of this case for a new trial in which

the jury would presumably decide whether Officer Rodriguez acted reasonably under the circumstances therein, precisely what he deems to be a matter of constitutional interpretation but which is, in reality, a question of fact. While the courts do establish constitutional standards, it is the jury which determines if the particular conduct in dispute comported with these standards. The jury is certainly not being called upon to make constitutional rulings as such. Further, since tort claims may clearly arise out of the violation of constitutional rights, there is no conflict between the two theories. They are simply different concepts, and the dissent has confused their meaning and application. The dissent, similarly, appears to perceive a potential discord between the New York State Penal Law and current judicial interpretation of the Fourth Amendment. Yet, defendant evidently does not share his concern and has never asserted this proposition. There is certainly no legal authority to support such a possibility.

The errors claimed in the charge which are raised by the defendant or *sua sponte* by the dissent are either nonexistent or insignificant and unpreserved. A reversal by this court would require a rejection of the jury's fact finding and its replacement with our own or penalizing the wrong party for unpreserved error. Either result would be a serious deviation from, and an abuse of, the authority which this court has on review.

Finally, as the Court of Appeals stated in *Caldwell v New Jersey Steamboat Co.* (47 NY 282, 286-287): "Where a legal proposition is presented for prompt decision, in such a variety of forms, with slight variations of language, it would be extraordinary if expressions could not be found which, considered separately, would not be obnoxious to criticism; but an appellate court will not seize hold of isolated portions of a charge for that purpose. If the charge, as a whole, conveyed to the jury the correct rule of law, on a given question, the judgment will not be reversed, although detached sentences may be erroneous; and if the language employed is capable of different constructions, that construction will be adopted which will lead to an affirmance of the judgment, unless it fairly appears that the jury were, or at least might have been, misled."

Consequently, the judgment of the Supreme Court, New York County (Leonard N. Cohen, J.), entered on March 8, 1990, which, following a jury trial, found in favor of plaintiff and awarded him damages in the total amount of

$4,343,721.24, should be affirmed, without costs or disbursements. Order of the Supreme Court, New York County (Leonard N. Cohen, J.), entered on May 14, 1990, denying defendant's motion to set aside the verdict, is affirmed, without costs or disbursements.

RUBIN, J. (dissenting). The central question in this case is whether an officer employed by defendant New York City Transit Authority used excessive force by shooting plaintiff McCummings in order to effect his apprehension while in immediate flight from the mugging of an elderly man. The leading case in this area is *Tennessee v Garner* (471 US 1), and while there is no substantive dispute as to its relevance, the scope of its application under the markedly different factual circumstances and statutory context of this case is sharply contested. Even the procedure by which a statutory provision is examined under the reasonableness standard enunciated in *Garner* is unsettled at this time. Given the potential exposure to liability (the judgment awarded in this case exceeds $4.3 million), the novelty of the legal issues presented and their significance to law enforcement, it is appropriate that the courts take a measured approach to their resolution.

I regard the *Garner* case *(supra)* as a narrow ruling with considerably more limited application than is perceived by the majority of this court and by other courts which have construed it. As I view the opinion, *Garner* imposes an external limit in circumstances where a resort to force authorized under State law leads to a constitutionally unreasonable result. I consider the New York State law on justification (Penal Law art 35) to be a fair and comprehensive statute, consistent with the Fourth Amendment reasonableness considerations articulated in *Garner,* which can be expected to produce a constitutionally acceptable result in the vast majority of situations to which it is applied.

I am also of the opinion that, while the *Garner* court abandoned, as arbitrary, the common-law distinction between felony and misdemeanor as a criterion for the use of deadly physical force, it did not abandon the distinction between the seriousness of crimes (particularly as reflected in their violence) which the common law endeavored to reflect. In this regard, I do not apprehend *Garner (supra)* as inviting or requiring a wholesale reassessment of which criminal acts are violent or dangerous in their commission.

Transit Officer Manuel Rodriguez was on plainclothes patrol

with his partner, Christine Mead, at the 96th Street subway station on the "A" line. They observed Bernard McCummings and his accomplices, Nathan Woods and Jacob Wise, acting suspiciously in the subway station but, at the time the assault took place, the officers had gone up to the street to avoid attracting the attention of the trio. Woods, who acted as lookout, positioned himself at the top of a stairway while McCummings and Wise carried out the assault on the landing, halfway down to the platform level. The victim, nearly 72 years of age, was punched in the face and choked by one assailant, Jacob Wise, while McCummings removed his watch, his wallet and the loose change from his pockets. Officer Rodriguez heard the victim's cries for help and encountered this scene as he ran down the subway steps (although whether during or immediately after the assault is a factual issue), followed closely by Officer Mead. According to the victim's testimony, Officer Rodriguez announced, "Drop him and freeze", whereupon the three culprits fled. (Rodriguez and his partner testified that he shouted, "Police, don't move.") Officer Rodriguez discharged five shots, two of which struck McCummings in the back, causing injury to the spine and rendering him a paraplegic. Another bullet struck his accomplice, Jacob Wise, in the upper right arm. McCummings collapsed at the bottom of the stairway and was arrested at the scene. Jacob Wise escaped Officer Mead's pursuit and was later arrested at the emergency room of St. Luke's Hospital where he had sought treatment for his gunshot wound. Nathan Woods also ran from the scene and was later arrested by members of the Major Case Investigation Unit, acting on information supplied by Jacob Wise. Bernard McCummings subsequently pleaded guilty to attempted robbery in the second degree (Penal Law § 160.10) which is a violent felony offense (Penal Law § 70.02 [1]). The Firearms Discharge Review Committee of the New York City Transit Police Department ruled that the shooting was "justified and within department guidelines."

At issue on this appeal is whether the jury was properly instructed on the criteria to be applied in determining if the shooting of McCummings was justified or if it represented an excessive use of force by the police officer. Defense counsel, in objecting to the court's instructions, urged that the relevant factors to be considered by the jurors are found in section 35.30 (1) of the Penal Law, which permits an officer to use deadly physical force when he reasonably believes it to be necessary to prevent flight and

"when he reasonably believes that:

"(a) The offense committed by such person was:

"(i) a felony or an attempt to commit a felony involving the use or attempted use or threatened imminent use of physical force against a person".

McCummings' claim against the New York City Transit Authority states three causes of action alleging, respectively, excessive use of force, negligent training and supervision and violation of rights under the United States Constitution. The IAS court dismissed the cause of action for negligent training and supervision at the close of plaintiff's case. The remainder of the action is founded upon the United States Supreme Court's decision in *Tennessee v Garner* (471 US 1, *supra),* an action brought pursuant to 42 USC § 1983 claiming a violation of the plaintiff's civil rights. That action arose out of the fatal shooting by a police officer of an unarmed, 15-year-old suspect for the sole purpose of preventing his flight following the burglary of a private residence. The Supreme Court, recognizing that circumstances exist where the use of deadly force against a fleeing felon is justified, ruled that the Tennessee statute was constitutional on its face but was unconstitutional as applied to the facts before the court.

Because there is general agreement between the parties to this case that *Garner (supra)* is dispositive of the issue presented, it is appropriate to analyze the opinion more closely to determine its impact upon State law. Its holding is that a statute which permits "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable" under the Fourth Amendment (471 US 1, 11, *supra).* Applying this concept to the facts before it, the majority stated, "A police officer may not seize an unarmed, nondangerous suspect by shooting him dead" *(supra,* at 11). From the court's discussion of the common law, it is clear that the rationale supporting this conclusion is that the distinction between felony and misdemeanor as a predicate for the use of deadly force is no longer viable. "In short, though the common-law pedigree of Tennessee's rule is pure on its face, changes in the legal and technological context mean the rule is distorted almost beyond recognition when literally applied" (471 US 1, 15, *supra).* The unadorned rule is, therefore, that deadly force may not be employed to apprehend a suspect solely because the crime for which he is sought is classified as a felony.

The result follows readily from the facts as perceived by the majority of the court. Edward Garner was a 15-year-old eighth-grader, 5-feet 4-inches tall and weighing between 100 and 110 pounds, who stole $10, a ring and a purse from a house (471 US 1, 4, ns 2, 4, *supra*). No one was home at the time of the burglary which, the opinion stresses, is classified by the F.B.I. as a " 'property' " crime and not a " 'violent' " crime (471 US 1, 21, *supra*). The majority was convinced that the officer who shot Garner did not fear for his personal safety, recognized the suspect was unarmed and fired at him only because Garner was climbing a fence and about to get away (471 US 1, 21). Even conceding the legitimate governmental interest in law enforcement, including the goals of effectiveness in making arrests and encouraging the peaceful submission of suspects, the majority stated, "we are not convinced that the use of deadly force is a sufficiently productive means of accomplishing them to justify the killing of nonviolent suspects" (471 US 1, 10, *supra*).

In place of the common-law distinction between felony and misdemeanor, *Garner (supra)* derives justification for the use of deadly force from the *danger* which the fleeing suspect represents. Examining the facts before it, the court concluded, "Although the armed burglar would present a different situation, the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous" (471 US 1, 21, *supra*). The indicia of "dangerousness" which the majority considers appropriate are stated in the alternative: "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon *or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm,* deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given" (471 US 1, 11-12, *supra* [emphasis added]).

Because it was confronted with a *nonviolent* felony perpetrated by an unarmed 15 year old, the court in *Garner (supra)* focused its attention on whether the fleeing suspect presented a threat of imminent harm *to the apprehending officer* and to bystanders. It should be readily apparent, however, that where a suspect poses a threat of serious injury to an officer or others, it is irrelevant that he may have committed a

predicate felony, a misdemeanor or no crime at all because deadly physical force may be employed to neutralize the threat, as a matter of self-defense of the officer or protection of the public *(see,* Penal Law § 35.30 [1] [c]). Because of the gross factual dissimilarity to the case at bar, the guidance provided by *Garner (supra,* at 12) is limited to the result that the time-worn distinction between felony and misdemeanor as a basis for the use of deadly force has been supplanted by the distinction between crimes "involving the infliction or threatened infliction of serious physical harm" and crimes of lesser violence.

The dissenting Justices in *Garner (supra,* at 32) complained that the majority failed "to outline the additional factors necessary to provide 'probable cause' for believing that a suspect 'poses a significant threat of death or serious physical injury,' * * * when the officer has probable cause to arrest and the suspect refuses to obey an order to halt". The majority opinion does not discuss the newly formulated rule and no examples of crimes which warrant the use of deadly force to apprehend a suspect are provided. The court does not supply a definition of the term "serious physical harm". There is no discussion of the public policy to be advanced by allowing police officers to shoot those suspected of more violent crimes to effect their arrest while permitting those suspected of less violent crimes to escape. Nor does the court articulate the nature of the danger posed by the escape of a violent felon, although some indication may be gleaned from a footnote concerning a difference of opinion with the three dissenting Justices over the relevance of certain statistics. In dismissing their significance, the majority states, "That has nothing to do with the question here, which is whether the fact that someone has committed a burglary indicates that he has committed, *or might commit, a violent crime" (Tennessee v Garner, supra,* at 22, n 23 [emphasis added]). The court does, however, acknowledge the problems attendant upon application of the formulated rule by officers in the field, stating, "We do not deny the practical difficulties of attempting to assess the suspect's dangerousness" (471 US 1, 20, *supra).*

The conclusion to be drawn is that *Garner (supra)* contemplates that such an assessment will be made ad hoc, based upon the facts presented, allowing the process of the common law to refine the concept of dangerousness through accumulated precedent. Indeed, the courts that have confronted the problem seem to have adopted this perspective. For instance,

in *Heath v Henning* (854 F2d 6, 9 [2d Cir 1988]), the court ruled that *Garner* requires consideration of "whether the officers acted reasonably, under the totality of the circumstances, in using deadly force to effect the arrest * * * While the Fourth Amendment test does take into account the officer's knowledge, e.g., whether an officer is aware that the suspect is armed or dangerous, or knows whether the alleged felony involved violence, its primary focus is on the attendant circumstances and the objective reasonableness of the officer's actions".

In cases which arise under a statute which takes a common-law approach to the use of deadly force, the courts have, out of necessity, applied the *Garner* standard exclusively. For example, in *Davis v Little* (851 F2d 605, 608-609, n 1 [1988]), the Second Circuit Court of Appeals was confronted with a Connecticut statute which permitted the use of deadly force where the officer was attempting to apprehend " 'a person whom he reasonably believes has committed * * * a felony' ", the very basis for the use of force found untenable in *Garner (supra)*. Under these circumstances, the court simply ignored State law, stating, "as *Garner* itself makes clear, the existence of a state statute does not fix the progress of constitutional law" (851 F2d 605, 610, *supra)*. However, where the State law reflects the standard enunciated in *Garner,* an altogether different situation is presented for, as *Garner* also makes clear, State law is controlling unless, when examined under the Fourth Amendment "objective reasonableness" standard *(see, Graham v Connor,* 490 US 386 [1989]), it is "constitutionally unreasonable" as applied to the facts of a given case *(Tennessee v Garner, supra,* at 11). Unfortunately, the distinction is one which, thus far, seems to have escaped attention.

Penal Law § 35.30 represents the law of this State with respect to the use of deadly force by a police officer in the apprehension of a fleeing felon. Unless a determination is first made that the statute is unconstitutional, either on its face or as applied to the facts of a given case, there is no reason to depart from the standard of conduct which it espouses. The rule enunciated in *Tennessee v Garner (supra)* is the relevant standard by which a statute is judged to accord a felon his rights under the Fourth Amendment. No decision has been brought to this court's attention, and none has been found, which has held Penal Law § 35.30 to be unconstitutional as applied to facts similar to those at bar *(see, Estate of Jackson v City of Rochester,* 705 F Supp 779 [WD NY 1989]; *see also,*

*Merzon v County of Suffolk,* 767 F Supp 432 [ED NY 1991]). To the contrary, the Second Circuit Court of Appeals has noted that section 35.30 of the Penal Law "requires the jury to conduct precisely the same analysis as does the reasonableness standard of *Garner" (Heath v Henning, supra,* at 9). The Circuit Court has further held that a violation of the statute does not necessarily constitute a violation of the Fourth Amendment because "not every instance of force proscribed by state law rises to the level of a constitutional violation so as to support a section 1983 [42 USC § 1983] action" *(Finnegan v Fountain,* 915 F2d 817, 821 [2d Cir 1990]).

The opinion in *Heath v Henning (supra),* however, fails to appreciate the distinction between a case arising under the common law and one involving a detailed statute utilizing the same criteria for the application of physical force approved in *Garner (supra).* While stressing the similarity between the reasonableness standards in *Garner* and New York's law on justification (Penal Law § 35.30), the Second Circuit Court of Appeals nevertheless criticized the District Court's instructions to the jurors on State justification as "ill-advised" and "unnecessary when considering section 1983 liability" *(Heath v Henning,* 854 F2d, *supra,* at 9). The result is that exactly the same analysis is applied as in *Davis v Little (supra),* involving Connecticut's common-law statute: State law is ignored, and the analysis proceeds entirely on Fourth Amendment grounds. This approach is at variance with *Garner,* which requires the court to determine the constitutionality of State law as applied to the circumstances of a suspect's apprehension.

Implicit in the Second Circuit Court's approach is a finding that State law regarding the circumstances in which force may be employed is simply immaterial to a determination of liability arising out of the use of force by a police officer. Had the United States Supreme Court intended to supplant State law in favor of a test predicated entirely on Fourth Amendment grounds, it would undoubtedly have said as much. To the contrary, however, the *Garner* court stated that where deadly force is used to prevent the flight of a suspect and the officer has "probable cause" to believe the crime involved the "infliction or threatened infliction of serious physical harm", even a statute based upon the common-law felony-misdemeanor distinction "would pass constitutional muster" *(Tennessee v Garner,* 471 US, *supra,* at 11, 12). The clear intent of *Garner* is that, once a statute is found to accord a suspect the

rights guaranteed under the Fourth Amendment, any liability for injury is to be determined as a matter of State law.

The practical difficulties inherent in the approach adopted by the Second Circuit Court of Appeals in *Heath v Henning (supra)* become apparent when claims arising under both the Federal Constitution and State law are asserted. An action brought in New York pursuant to 42 USC § 1983 is likely to include a pendent State claim which requires application of the criteria contained in Penal Law § 35.30 in addition to the *Garner* Fourth Amendment standard, thus presenting an element of confusion about which the Second Circuit Court of Appeals expressed concern *(Heath v Henning,* 854 F2d, *supra,* at 9).

*Merzon v County of Suffolk* (767 F Supp 432, *supra)* is a good illustration. There, as here, the plaintiff stated a claim under 42 USC § 1983 together with claims under State law. The court first addressed the Fourth Amendment issue, applying the "objective reasonableness" standard derived from *Garner (supra)* in *Graham v Connor (supra),* concluding that the plaintiff failed to establish a violation of rights guaranteed by the United States Constitution. The court then addressed the pendent State claim, ruling that the battery committed by the apprehending officer was justified under the criteria set forth in Penal Law § 35.30. (The District Court did not, however, undertake any assessment of whether Penal Law § 35.30 is constitutional as applied to the facts before it.) The plaintiff's third cause of action based on negligent hiring and training was dismissed for lack of proof.

In presenting a case to a jury, there is always a potential for confusion when two different theories of recovery are asserted, each of which requires application of a different legal standard to the same set of facts. The potential is greatly compounded where, as in the matter under review, internal agency regulations are admitted into evidence, introducing yet another theory of recovery based upon a violation of those regulations. The legal significance of agency regulations can be radically different depending upon the particular cause of action pleaded. For example, operating regulations are obviously material to the adequacy of the training provided by defendant Transit Authority to its police officers. The operative question with respect to the Transit Authority regulations, therefore, is the use which was made of them at trial and not simply the propriety of their introduction into evidence.

Plaintiff McCummings asserts the same causes of action as did the plaintiff in *Merzon (supra)* and, as in that case, the cause of action founded upon negligent training and supervision was dismissed by the trial court, rendering unnecessary discussion of the significance and use of the regulations in this regard. Plaintiff's remaining claims state two separate and distinct causes of action to which different legal standards apply and with respect to which defendant's operating regulations must be accorded entirely different treatment. Plaintiff's Fourth Amendment claim questions the reasonableness of police actions and attacks the constitutionality of the State law under which the apprehending officer acted. If, as in *Garner (supra)*, the State statute is found to be unconstitutional as applied to the facts of the case, then it is for the trier of fact to determine if any policy or custom of defendant agency was responsible for the deprivation of the plaintiff's Fourth Amendment right to be free from unreasonable seizure *(Tennessee v Garner*, 471 US, *supra*, at 22). In this regard, agency regulations are germane to an assessment of the effort directed to secure compliance, by Transit Authority officers, with the constitutional requirement that the force employed in effecting an arrest be reasonable. To impose liability, plaintiff is required to demonstrate that agency standards are not, *at a minimum*, as restrictive as the standards set forth in *Garner* so as to protect a suspect's Fourth Amendment rights.

By contrast, the claim based upon respondeat superior for an intentional tort committed by the Transit Authority's employee is governed entirely by State law concerning justification (Penal Law § 35.30). Use of internal regulations in this context would unfairly place the agency in a paradoxical situation: to the extent that the agency sought to insulate itself from liability for Fourth Amendment violations by making its regulations even more stringent than the *Garner* standard, it would expose itself to greater liability in tort. Thus, as discussed below, agency regulations are not to be considered in connection with the issue of justification.

The potential for confusion in asking jurors to determine both legal and constitutional questions, governed by different legal standards requiring, in each instance, that agency regulations receive disparate treatment is obvious. The solution is, fortunately, equally obvious. The problem is obviated by a determination of the constitutional question as a threshold issue by the court, submitting to the jurors either the question of whether State justification criteria are met or, in the

alternative, the question of whether the agency adopted a policy or custom which resulted in the deprivation of the suspect's rights *(Monell v New York City Dept. of Social Servs.,* 436 US 658).

It would appear, moreover, that these two bases for recovery —Fourth Amendment and tort—are not only distinct, but also mutually exclusive. If an officer's actions are justifiable under a State law which is constitutional as applied to the facts of the case, then the only inquiry is whether the plaintiff has shown by a preponderance of the credible evidence that the circumstances did not justify the use of force pursuant to statute. If, however, the statute is not constitutional as applied to the facts of the case, then the relevant inquiry is whether a policy or custom of the agency operated to deprive the plaintiff of rights secured by the Fourth Amendment.

The error committed in this case was the attempt to combine these two alternate grounds for liability, resulting in a hopelessly confusing charge affording the jurors no basis upon which to assess defendant's fault. As this court has stated, "where the error is so fundamental as to preclude consideration of the central issue upon which the claim of liability is founded, the court may, in the interests of justice, proceed to review the issue even in the absence of objection or request" *(Rivera v Bronx-Lebanon Hosp. Center,* 70 AD2d 794, 796). Furthermore, while defense counsel may not have grasped the scope of the error or been able to articulate it with precision, his objections on the record are sufficient to preserve the issue for appellate review. The court's instructions are difficult to comprehend, and counsel may not be faulted for failing to perform, contemporaneously, an analysis of considerable complexity.

The threshold question to be addressed is whether the provisions of Penal Law § 35.30 accord plaintiff the rights guaranteed him under the Fourth Amendment or whether the statute, as applied to the facts of this case, is unconstitutional. It bears emphasis that Penal Law § 35.30 (1) observes the criterion endorsed by the Supreme Court in *Garner (supra),* viz., the danger which the suspect represents as suggested by either the immediate threat he poses to the officer or others or the violent nature of the crime for which his apprehension is sought. The statute provides:

"1. A police officer or a peace officer, in the course of effecting or attempting to effect an arrest, or of preventing or

attempting to prevent the escape from custody, of a person whom he reasonably believes to have committed an offense, may use physical force when and to the extent he reasonably believes such to be necessary to effect the arrest, or to prevent the escape from custody, or to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force; except that he may use *deadly physical force* for such purposes only when he reasonably believes that:

"(a) The offense committed by such person was:

"(i) a felony or an attempt to commit a *felony involving the use or attempted use or threatened imminent use of physical force* against a person; or

"(ii) kidnapping, arson, escape in the first degree, burglary in the first degree, or any attempt to commit such a crime; or

"(b) The offense committed or attempted by such person was a felony and that, in the course of resisting arrest therefor or attempting to escape from custody, such person is armed with a firearm or deadly weapon; or

"(c) Regardless of the particular offense which is the subject of the arrest or attempted escape, the use of deadly physical force is necessary to defend the police officer or peace officer or another person from what the officer reasonably believes to be the use or imminent use of deadly physical force" (emphasis added).

In applying the justification statute, the courts of this State have gone so far as to note that "there can be no cavil with the proposition that a citizen may use reasonable force in self-defense where the force exerted by the police in effecting an arrest is excessive * * * Nor can there be any doubt that force used by the police may reach such dimensions as to be illegal" *(People v Stevenson,* 31 NY2d 108, 112; *see, People v Robinson,* 174 AD2d 998, *lv denied* 78 NY2d 1014). "It has been held that even if a policeman is in the lawful course of his duties, the use of excessive force would be a legal basis for a finding of assault *(Jones v State of New York,* 33 NY2d 275; *Hinton v City of New York,* 13 AD2d 475)" *(Stein v State of New York,* 53 AD2d 988).

The gravamen of plaintiff's action, however it may be expressed in his complaint, is the intentional tort of assault and battery. There is no doubt that a battery was committed. Officer Rodriguez admittedly fired two bullets into the back of Bernard McCummings, as the IAS court repeatedly reminded

the jurors during the course of delivering its instructions. The only issues to be decided are whether the shooting was justified pursuant to State law and whether the statute, as applied to the facts at bar, is consistent with plaintiff's Fourth Amendment right to be free from unreasonable seizure *(Tennessee v Garner, supra)*. If the shooting was justified under State law, there is no basis upon which to hold defendant liable for the battery committed by its employee, Rodriguez *(Merzon v County of Suffolk,* 767 F Supp, *supra,* at 448-449; *Jones v State of New York, supra,* at 279). And, if the statute under color of which Rodriguez acted is consistent with the Fourth Amendment, there is no basis upon which to hold defendant liable for the violation of plaintiff's right to be free from the unreasonable seizure which the assault and battery is alleged to represent.

Whether the shooting is justified under State law is clearly a question for the trier of fact *(Jones v State of New York, supra,* at 280). Whether the statute determinant of the justification issue is constitutional is just as clearly a question for the court which must be decided before the jury can be instructed on the law. In considering this question, "[i]t must be assumed that the Legislature intended to enact a statute which was in harmony with the United States Constitution and the Constitution of the State of New York" *(People v Epton,* 19 NY2d 496, 505, *cert denied and appeal dismissed* 390 US 29). Furthermore, as a matter of policy, the courts of this State must "construe statutes in such a manner as to uphold their constitutionality" *(People v Kaiser,* 21 NY2d 86, 103, *affd* 394 US 280, *reh denied* 394 US 1025). Therefore, irrespective of the course adopted by the Second Circuit Court of Appeals in *Heath v Henning* (854 F2d 6, *supra),* this court does not have the discretion to ignore State law in favor of a broad constitutional standard which, as it applies to the facts of this matter, remains to be defined by case law.

In deciding whether Penal Law § 35.30 is constitutional as applied to the facts of this case, the court must determine whether or not the use of deadly force against a suspect in immediate flight from the commission of "a felony or an attempt to commit a felony involving the use or attempted use or threatened imminent use of physical force against a person" is reasonable in view of the Fourth Amendment considerations set forth in *Garner (supra)*. As noted, the statute, insofar as it applies to the facts at bar, employs the criterion of dangerousness—as indicated by the violent nature of the

felony committed or attempted—which was endorsed in *Garner (supra)* and the objective reasonableness standard which was applied in *Graham v Connor* (490 US 386, *supra; Heath v Henning, supra,* at 9). Therefore, the statute is philosophically consistent with controlling authority.

Of immediate concern in utilizing the statute as the basis for determining liability is whether, under the circumstances involved in this case, the statutory requirement that the felony involve the threat or use of "physical force against a person" is functionally equivalent to the requirement, stated in *Garner (supra,* at 11), that the crime involve the potential "infliction of serious physical harm". While it is not readily apparent, a fair construction of Penal Law § 35.30 (1) (a) (i) is that, by employing the language "a felony * * * involving * * *. physical force" directed "against a person", the Legislature intended to designate a "violent felony offense". Every crime which is considered a violent felony is enumerated in Penal Law § 70.02 (1). Nothing in *Garner* suggests that it is constitutionally unreasonable to regard someone who . has committed one of the specified violent felony offenses as dangerous. Notably, one of the crimes listed is burglary involving the use of a weapon (Penal Law § 140.30, burglary in the first degree), an offense which the United States Supreme Court specifically distinguished from the situation presented by the *Garner* case (471 US, *supra,* at 21). However, as discussed earlier, the approach suggested by *Garner* is that each offense be evaluated ad hoc, under the circumstances of a particular suspect's apprehension *(Graham v Connor,* 490 US, *supra,* at 396).

In deciding *Garner (supra,* at 21), the United States Supreme Court placed considerable emphasis upon the nature of the crime involved, as reflected in the classification of burglary by the F.B.I. as a " 'property' " crime. In the instant matter, the statutory classification of robbery in the second degree as a violent felony offense (Penal Law § 70.02 [1] [b]) is no less significant. The statute reflects the common law regarding robbery. As one court observed, "the rule followed in both England and the United States has been that the crime of robbery involves the taking of property by means of force or violence or by putting the victim in fear of suffering serious physical harm" *(Ryder v City of Topeka,* 814 F2d 1412, 1419, n 17 [10th Cir 1987]). In *Ryder (supra,* at 1420), which involved the shooting of an unarmed, 14-year-old girl by a police officer, the court determined that the shooting was justified based not

on the type of crime, which the court found to be "non-violent" and "consensual" in nature, but on the fact that the officer reasonably believed the suspect to be armed and dangerous. The Tenth Circuit Court of Appeals noted that "theft lacks the threat of bodily harm or force that makes robbery such an inherently dangerous and violent crime" (814 F2d 1412, 1420, *supra*). In the subsequent case of *Ramos Ayala v Diaz Martinez* (707 F Supp 75, 77 [1988]), the United States District Court for the District of Puerto Rico dismissed a claim of the unjustified use of force by a police officer on the ground that the suspect was shot and killed while in immediate flight from the scene of a robbery which the court, citing *Ryder (supra)*, characterized as "an inherently dangerous and violent crime". The court concluded, "Even if we draw the inference that decedent was unarmed, summary judgment would be appropriate" under *Garner (supra)* because of the violent nature of the crime (707 F Supp 75, 78, *supra*).

Robbery is defined in section 160.00 of the Penal Law as forcible stealing wherein the felon "uses or threatens the immediate use of physical force". It is recognized by the Legislature as a crime justifying the use of deadly physical force in the defense of a victim (Penal Law § 35.15 [2] [b]). If, as the Federal cases suggest, robbery is an inherently dangerous and violent crime, it is an offense which implicitly involves the threat of "serious physical harm", to use the terminology employed both in *Garner (supra*, at 11) and *Ryder (supra*, at 1419), justifying the use of deadly physical force to apprehend a robbery suspect. The courts of this State recognize robbery as a crime of innate violence and danger. "In considering what degree of physical force is sufficient to constitute a robbery, it should be borne in mind that the law of robbery, and indeed other forms of aggravated theft, developed 'to protect not only against misappropriation [of property] but also against injuries which may result from peculiarly dangerous means devised for accomplishing misappropriation' (Note, 54 Col L Rev 84). 'Regardless of the success of the misappropriation, aggravated theft is always accompanied by the possibility of physical or psychic injury to the victim' " *(People v Santiago*, 62 AD2d 572, 579 [quoting Note, 54 Colum L Rev 84, 109], *affd* 48 NY2d 1023). Therefore, as applied to the apprehension of a robbery suspect by a police officer, Penal Law § 35.30 is consistent with the Fourth Amendment criteria set out in *Garner*.

If it may be said that the statute affords Fourth Amend-

ment protection to robbery suspects in general, it certainly does not abrogate Fourth Amendment guarantees under the circumstances presented by the apprehension of Bernard Mc-Cummings. McCummings was in immediate flight from the commission of a violent felony to which Transit Officer Rodriguez responded. McCummings entered a negotiated plea of guilty to the attempt to commit the felony of robbery in the second degree. The victim was held in a choke hold and, according to his testimony, this was witnessed by the officer as he came upon the scene. The punching and choking of the victim constitutes the use of physical force as contemplated by the definition of second degree robbery (Penal Law § 160.10 [2] [a]; *People v Greene,* 70 NY2d 860, *rearg denied sub nom. People v Bogan,* 70 NY2d 951 [victim pushed to ground and held in choke hold]), a violent felony offense (Penal Law § 70.02 [1]), and by the definition of justification as it applies to the use of deadly physical force in making an arrest (Penal Law § 35.30 [1] [a] [i]). At the least, the force employed by the felons was sufficient, as a matter of law, to put the elderly victim in fear of sustaining "serious physical harm" *(Ryder v City of Topeka, supra,* at 1419). In a statement given to police, Jacob Wise, one of plaintiff's accomplices, said, "I choked him and told him not to scream he started to scream and I choked him harder."

I am not aware of any case which has required an assessment of the constitutionality, pursuant to *Tennessee v Garner (supra),* of a State law which justifies the use of deadly physical force against a fleeing felon based upon the violent nature of his crime (as opposed to the common-law distinction between felony and misdemeanor which *Garner* rejects). It is therefore understandable that the instructions given to the jury in this matter reflect a certain confusion regarding the applicable law. At the outset, the jurors were told, "Generally under the law it is held by the United States Supreme Court the use of deadly physical force by a police officer is unreasonable and unjustified if it is merely intended to prevent a felon from fleeing from a crime and who poses no immediate threat of serious physical injury or harm to an officer or others." This synopsis of *Garner (supra)* omits mention of the alternate ground justifying the use of deadly physical force provided by the violent nature of the crime involved. When the IAS court did address this alternate ground of justification, the jurors were told that "a police officer may use deadly physical force to arrest or prevent the escape of a person from custody only

when the officer reasonably believes that the person committed the felony or attempted to commit the felony involving the use or infliction or threatened eminent *[sic]* use or infliction of *serious* physical harm against another person. Provided the *level* of such deadly force used by the officer is reasonably believed by him to be necessary and not excessive to prevent an escape from custody and if where feasible some warning was *[sic]* given" (emphasis added). The court continued, "I might say serious physical injuries are defined under the Penal Law as an injury which creates a substantial risk of death or which causes death and protracted disfigurement or protractive *[sic]* impairment of health or protractive *[sic]* loss or impairment of a bodily organ or function." The latter instruction is the definition of "serious physical injury" found in section 10.00 (10) of the Penal Law. Defense counsel promptly registered his exception to the court's use of the statutory definition of "serious physical injury".

These instructions contain two substantive errors sufficient to require a new trial. First, the justification statute requires only that the felony committed involve the "use or attempted use or threatened imminent use of physical force against a person" (Penal Law § 35.30 [1] [a] [i]) and not "serious physical injury". While the United States Supreme court provided no clarification of what was meant by "a crime involving the infliction or threatened infliction of serious physical harm" *(Tennessee v Garner, supra,* at 11), it is patently unreasonable to assume that the court had the New York definition of "serious physical injury" in mind when it employed the term "serious physical harm". A far more tenable construction is that the harm inflicted or threatened must be " 'substantial' " *(Matter of Philip A.,* 49 NY2d 198, 200) and therefore within the statutory definition of "physical injury" (Penal Law § 10.00 [9]; *People v McDowell,* 28 NY2d 373; *People v Rodney,* 134 AD2d 463) and consistent with the common-law concept of robbery as "the taking of property by means of force or violence or by putting the victim in fear of suffering serious physical harm" *(Ryder v City of Topeka, supra,* at 1419, n 17; *People v Greene, supra).* The choking and punching of the elderly victim was certainly sufficient force to put him in fear of sustaining serious physical harm, even though it resulted in no protracted impairment and may not have created any substantial risk of death.

The second substantive error in the instructions given to the jurors is the imposition of a requirement that the "level"

of deadly force employed to capture McCummings had to be reasonably believed by the apprehending officer to be "necessary and not excessive". Both the Penal Law and *Tennessee v Garner (supra)* speak only of deadly force and do not attempt to distinguish *levels* of deadly force. The jurors were therefore left to speculate as to what "level" of deadly force might be reasonable under the circumstances and what might be excessive. However, the giving of a warning to the suspect, when feasible, is material to a consideration of whether the apprehending officer reasonably believed the use of deadly force to be necessary, and there is no inconsistency in *Garner* and State law in this regard.

The jurors were clearly confused by the court's charge regarding justification because reinstruction was requested, at which time defense counsel renewed his objection to the charge. The court, however, simply directed the court reporter to read back its previous instructions on the subject.

During the precharge conference, the court indicated to counsel that it considered Penal Law § 35.30 and *Garner (supra)* to be in harmony stating, "I still believe that *Garner* is consistent with the statute", and, "As to *Garner* and 35.30 [they] are the same and they a[r]e consistent". Yet, the court departed from the language of the statute and engrafted onto it the requirement that the subject felony involve "serious physical injury", as defined in Penal Law § 10.00 (10). Thus, "necessarily implied in the decision" is a finding, *sub silentio,* that the statute as written fails to accord plaintiff the Fourth Amendment rights delineated in *Garner (supra),* a finding which constitutes an independent basis for this court's appellate review (CPLR 5701 [a] [2] [vii]).

That the victim in this case did not sustain serious physical injury is not dispositive, contrary to the instructions given to the jurors, but merely fortuitous. (The victim was treated for abrasions to the face and head.) Violence is a slippery path, and the criminal who embarks upon it cannot be sure how far down it he may slide. The harm which is actually inflicted during a robbery attempt may be tragically different from that which was intended by the assailant *(People v Santiago,* 62 AD2d 572, *affd* 48 NY2d 1023, *supra* [purse-snatching victim crushed to death by subway car]; *People v Sanders,* 173 AD2d 391, *lv denied* 78 NY2d 1014 [victim, pushed to ground during attempted robbery striking head on pavement, dies from injury]) or from the consequences which might logically be expected to result from the intended nature of criminal

conduct directed against an elderly or infirm victim *(People v Ingram,* 67 NY2d 897 [victim of apparent burglary attempt suffers myocardial infarction and expires]). The extent of the injury which might have been inflicted had Transit Officers Rodriguez and Mead not been present to intervene cannot be surmised. It is perhaps because of an appreciation of the practical difficulty in containing the extent of injury which follows from the felon's resort to force which led the Legislature to authorize the use of deadly force against a suspect for the use of "physical force" (Penal Law § 35.30 [1] [a] [i])—as opposed to the infliction of some specified severity of injury *(see,* Penal Law § 10.00 [9], [10])—during the commission of a felony.

The jury was also erroneously instructed to consider defendant Transit Authority's regulations governing the use of deadly force. In objecting to the court's proposal to permit consideration of these regulations by the jurors during deliberation, defense counsel pointed out, quite correctly, that "the justifiableness of a shooting can only be judged by legal standards". This action must be distinguished from cases in which an officer commits an act of recklessness resulting in injury to a bystander during the course of an otherwise justified shooting, for which the officer remains liable by express statutory provision (Penal Law § 35.30 [2]; *see, e.g., Shaw v Manufacturer's Hanover Trust Co.,* 95 AD2d 738). It must be emphasized that this is not a negligence case where the parties are free to stipulate as to the standard of conduct which is appropriate under the circumstances. This matter involves an intentional tort which is either justified or not justified under State law, and defense counsel so advised the court. The standard with respect to justification which applies to this case is set forth in Penal Law § 35.30 *(Merzon v County of Suffolk,* 767 F Supp, *supra,* at 448-449; *Cook v City of New York,* 82 AD2d 72, 75-76), and any question regarding the interpretation of that statute is a question of law for the court.

Mere administrative regulations may not be placed on an equal footing with a statute so as to compromise the intent of the Legislature in enacting it *(Georgiou v State of New York,* 28 AD2d 1027, *lv denied* 21 NY2d 641). As this court recently stated in *Clarke v New York City Tr. Auth.* (174 AD2d 268), "internal rules * * * are not admissible, when they impose a standard higher than that otherwise set by law" (citing *Rivera v New York City Tr. Auth.,* 77 NY2d 322, 329; *Crosland v New*

*York City Tr. Auth.,* 68 NY2d 165, 168-169). While defendant's regulations were properly admitted into evidence in connection with plaintiff's action for negligent training and supervision, they ceased to have any relevance to this case as soon as the negligence cause of action was dismissed. Defense counsel advanced precisely this argument upon renewing his objection to the use of defendant's regulations by the jurors during deliberations. (As noted above, if Supreme Court's *sub silentio* ruling that Penal Law § 35.30 is unconstitutional as applied to the facts of this case were proper, the regulations would then be relevant to the jurors' consideration of whether any policy or custom adopted by the Transit Authority Police Department resulted in the deprivation of plaintiff's constitutional rights, as required for liability in *Monell v New York City Dept. of Social Servs.,* 436 US 658, *supra.)*

In light of the numerous objections raised by defense counsel to proposed instructions and his timely exception to numerous elements of the charge delivered by the court, as well as the court's implicit ruling that Penal Law § 35.30 is not constitutional as applied to the facts of this case by virtue of its failure to mention "serious physical harm" (however that term should be construed), there can be no doubt that the issue raised upon this appeal has been preserved for review. Having asserted in timely fashion, during the precharge conference and again upon the jurors' request for reinstruction on the law of justification, that this issue is governed by Penal Law § 35.30, defense counsel put the court on notice as to the existence of a controlling statute asserted to be dispositive of the issue presented *(see, Arbegast v Board of Educ.,* 65 NY2d 161, 163, n 1). Defendant has done all that is required to preserve for review the question of whether the statute is the standard by which the reasonableness and lawfulness of Transit Officer Rodriguez's shooting of plaintiff McCummings is to be determined. Defense counsel was not required to advance any argument in favor of the statute's constitutionality: a presumption to that effect operates in his favor, and the burden falls upon plaintiff's counsel to rebut the presumption (McKinney's Cons Laws of NY, Book 1, Statutes § 150 [b]).

The United States Supreme Court's opinion in *Tennessee v Garner (supra),* requires the courts of this Nation to take a reasonable approach regarding the seizure of felony suspects based upon the danger which they represent (reflected, in this instance, by the violence of the pertinent crime). The opinion makes clear that police officers—and the courts—must distin-

guish between suspects who, by their acts, constitute no danger and those who have demonstrated a capacity for violent assaultive behavior. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of ' "the nature and quality of the intrusion on the individual's Fourth Amendment interests" ' against the countervailing governmental interests at stake" *(Graham v Connor,* 490 US 386, 396, *supra).* A balancing of the State's interest in effective law enforcement, including the apprehension of suspects, and the felon's interest in being free from unreasonable seizure does not require that officers refrain from employing their weapons to prevent escape in every instance *(see, Tennessee v Garner,* 471 US, *supra,* at 11).

Accordingly, the judgment of the Supreme Court, New York County (Leonard N. Cohen, J.), entered March 8, 1990, upon a jury verdict in favor of plaintiff in the amount of $4,343,721.24, and the order of the same court, entered May 14, 1990, denying defendant's motion to set aside the jury verdict, should be reversed, on the law, without costs, and the matter remanded to Supreme Court for a new trial on the question of whether the shooting of plaintiff was justified pursuant to Penal Law § 35.30.

CARRO, J. P., ELLERIN and ROSS, JJ., concur with MILONAS, J.; RUBIN, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered on March 8, 1990, and order of said court entered on May 14, 1990, affirmed, without costs or disbursements.